

# IN THE
# TENTH COURT OF APPEALS

_____

**No. 10-14-00197-CR**
**No. 10-14-00198-CR**
**No. 10-14-00199-CR**

**BRODERICK JERMAINE GRBA,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

_____

**From the 21st District Court**
**Burleson County, Texas**
**Trial Court Nos. 14,293, 14,294 and 14,295**

**MEMORANDUM  OPINION**

In three indictments, Broderick Jermaine Grba was charged with the felony offenses of murder, aggravated assault with a deadly weapon, and burglary of a habitation (to which Grba pled guilty).  The cases were consolidated and tried together, and a jury found him guilty and assessed a life sentence and a $10,000 fine on the murder charge.  The jury assessed twenty-year sentences and $10,000 fines on each of the other

two charges. Grba raises three issues in the murder case; the second and third of those issues are identically raised in the other two cases. We will affirm.

In the murder case, Grba's first issue asserts that the trial court erred in failing to include a "sudden passion" instruction in the punishment charge over Grba's objection. The evidence shows that Anthony Allen, Grba's friend, had a long-running dispute with Marcus Carroll, the murder victim, and that Grba had been involved in some of the altercations between Allen and Carroll. On the evening in question, Carroll and Antwon Heslip, his cousin and close friend, and Jovan Jefferson, another friend, met at the Cotton Village apartments in Snook and then went to a party at the Legion Hall in Somerville, with Carroll driving separately. Jefferson said that Allen was at the party and walked up to Carroll and said to him, "I'm going to kill you tonight." He later saw Allen aggressively approach Carroll in the hall's parking lot. Heslip said that when they were in the parking lot, Allen very aggressively approached Carroll but Heslip was able to get between them and separate them. Heslip's group then went back into the party until the hall closed. Heslip did not see Grba at the party in Somerville. Latisha McKee, Carroll's girlfriend, testified that Carroll called her from the party and told her that he and Allen had "got into it."

McKee later looked out her window and saw Allen approach and knock on the door of the apartment of Grba, who lived across the parking lot. She looked later again and saw Heslip pulling into a parking spot in front of her apartment and Allen and Grba walking toward Heslip. She went outside and told Allen and Grba, "Don't y'all start this shit." Heslip then got out of his car as Carroll was driving into the parking lot. McKee

testified that Grba then said to Heslip, "What's up, nigger?", immediately pulled a gun from his pocket, and began shooting Heslip. McKee then ran to Carroll and told him to run, but he replied, "I'm tired of this shit." McKee then ran into her apartment and heard more shots being fired. She then helped the wounded Heslip into her apartment, and 9-1-1 was called.

After EMS arrived and were attending to Heslip, McKee went outside and behind the apartment building, where she discovered an unresponsive Carroll lying on the ground. Carroll had been shot. DPS trooper John Anderson was the first law-enforcement officer to arrive, and he found Heslip bleeding severely from the leg in one apartment and Allen with a gunshot wound to his leg in another apartment. He also discovered Carroll's body behind the apartment building with a 9 mm. Glock handgun on the ground next to Carroll, who had been shot once in the upper back. Caldwell police officer Tim Davis responded to the crime scene and determined that all of the rounds in the Glock had been fired. Texas Ranger Steven Jeter found a Browning .380 handgun on the ground near the back of Grba's apartment. That .380 handgun had been stolen in a burglary of Carroll and McKee's apartment (the burglary that Grba pled guilty to), and ballistics testing later determined that the bullet that killed Carroll was shot from that .380 handgun. Grba was found in his apartment and taken into custody for questioning.

Tristan Merida, Carroll and Heslip's cousin, had seen them in Somerville after the party and decided to come to the apartments in Snook. As he arrived, he parked next to Heslip's car and soon saw Allen and Grba walking toward them. At that same time, Merida saw Carroll driving into the parking lot. Merida then saw Grba pull out a gun

and start shooting. Merida ran to the back of the apartment complex and saw Carroll ducking down between two cars. As Merida continued to run, he heard more shots being fired.

Heslip testified that, after leaving the party and getting gas, his car arrived first at the apartments in Snook. He parked near Carroll and McKee's apartment, and Jefferson got out first and began walking away. About a minute later, Heslip, who was unarmed, began to get out his car and saw a shirtless Allen walking across the parking lot toward him with Grba walking close behind Allen. That was the first time that evening that Heslip saw Grba. Allen said something to Heslip, but Heslip said nothing to Allen, and then Grba pulled out a gun and started shooting Heslip several times. Heslip went down, and Allen and Grba walked away. Heslip, who was shot four times, struggled into McKee and Carroll's apartment. He suffered serious injuries, including the loss of a leg. The charge of aggravated assault with a deadly weapon pertained to Grba's shooting Heslip.

After Grba was taken into custody for investigation later that morning, Jeter conducted a recorded interview with him. Grba initially denied any involvement in the shootings, but eventually said that Allen got him out of bed to provide back up because he was going to fight Carroll. Grba said that the conflict was between Carroll and Allen and that he was not personally mad at Carroll. Because he "was scared for [his] life," Grba got his gun. As they were walking across the parking lot, Carroll shot at them and hit Allen in the leg. Grba said he shot at Heslip because Carroll had shot first, but Grba

said that he fired only toward the ground at Heslip. He said he could not remember shooting at Carroll.

A few days later, Grba asked to talk to Burleson County Deputy Sheriff Gene Hermes. In a video-recorded interview that was played for the jury, Grba said that he and his girlfriend were asleep in bed when Allen woke him up by knocking on the front door. Allen told Grba that Heslip had said at the party in Somerville that he intended "to do something to him [Allen]" and that Allen needed Grba as a back up to give him protection. Grba's girlfriend asked him not to go with Allen.

Three weeks before, Grba had gotten into an altercation with Carroll where Carroll scratched Grba's face and told Grba that he intended to kill him. Two weeks before, Grba and another person broke into Carroll and McKee's apartment and stole marijuana and a gun—the .380 that he used to shoot Heslip and Carroll.

Grba said that he and Allen went to the parking lot and sat in Allen's car. Grba was rolling a blunt when Heslip and Carroll arrived and parked. Grba walked with Allen toward Heslip to make sure that Allen did not get jumped, and Grba saw Carroll standing beside Carroll's car to their side. Before they got to Heslip, Allen exclaimed that he was shot in the leg. Grba said that Carroll shot first, and then he said he pulled out his gun and starting shooting in the directions of Heslip and Carroll. Grba said he fired his gun as "a reaction thing" and "out of fear" when he heard shots from Carroll's direction and Allen got hit. After first shooting at Heslip and Carroll, he ran after Carroll, who was running around the apartment building. When Grba got to the corner of the building, he fired more shots in Carroll's direction.

After the shooting was over, Grba helped Allen into Allen's mother's apartment. Grba then went to his own apartment, hid the gun in the back on the ground by the steps, and went inside and fell asleep.

The charge included instructions on self-defense, deadly force in defense of person, and defense of third person. The jury found Grba guilty of murder. Over Grba's objection, the trial court did not include a "sudden passion" instruction in the punishment charge.

In *Wooten v. State*, a remarkably similar murder case, the Court of Criminal Appeals addressed the trial court's rejection of a sudden-passion instruction in the punishment charge after the jury had already found the defendant guilty of murder despite his self-defense claim, which the jury had been instructed on. 400 S.W.3d 601, 603-04 (Tex. Crim. App. 2013).

> Under the current statutory scheme, the question of whether a defendant killed while under the immediate influence of sudden passion is a punishment issue.
>
> Currently, a murder committed under the "immediate influence of sudden passion arising from an adequate cause" is a second-degree felony carrying a maximum punishment of twenty years' imprisonment. Sudden passion is "passion directly caused by and arising out of provocation by the individual killed" which arises at the time of the murder. Adequate cause is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." The defendant has the burden of production and persuasion with respect to the issue of sudden passion. To justify a jury instruction on the issue of sudden passion at the punishment phase, the record must at least minimally support an inference: 1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) that his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of

ordinary temper; 3) that he committed the murder before regaining his capacity for cool reflection; and 4) that a causal connection existed "between the provocation, passion, and homicide." It does not matter that the evidence supporting the submission of a sudden passion instruction may be weak, impeached, contradicted, or unbelievable. If the evidence thus raises the issue from any source, during either phase of trial, then the defendant has satisfied his burden of production, and the trial court must submit the issue in the jury charge—at least if the defendant requests it.

When an appellant protests that the trial court erred not to grant his request to charge the jury regarding sudden passion, a reviewing court must first determine whether the complained-of error exists. If the reviewing court agrees that a trial court erred by failing to submit a sudden passion instruction, it then analyzes whether the error harmed the appellant. Harm does not emanate from the mere failure to include the requested instruction. A reviewing court undertakes a harm analysis by following the standards as set out in the Texas Code of Criminal Procedure Article 36.19. If the error is preserved, the record must demonstrate that the appellant has suffered "some harm." In an *Almanza* harm analysis, "burdens of proof or persuasion have no place[.]" Harm must be evaluated in light of the complete jury charge, the arguments of counsel, the entirety of the evidence, including the contested issues and weight of the probative evidence, and any other relevant factors revealed by the record as a whole. To assay harm, we focus on the evidence and record to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction.

*Id.* at 605-06 (footnotes and citations omitted).

Grba's argument for a "sudden-passion" instruction relies on the recorded statements where he said that he shot Carroll (and Heslip) out of fear after Carroll had first shot Allen in the leg.[1] In *Wooten*, the court addressed the same argument, as the defendant had testified that he shot the victim out of fear because the victim had shot at him first. *Id.* at 603, 606-07.

---

[1] Grba's brief also suggests that he could have been reacting out of anger at him and Allen being shot at, but in his statements, Grba never claimed to have actually acted out of anger. *See Wooten,* 400 S.W.3d at 607 n.33. To the extent Grba premises error on this account, the trial court did not err because the record does not at least minimally support that inference. *See id.*

Relying on *Daniels v. State*, the State argues that the trial court did not err by failing to include a sudden passion instruction because the appellant's assertion of a "bare claim of fear" at the trial level did not rise to the level of terror necessary to trigger a sudden passion instruction. In *Daniels*, we explained that "a bare claim of" fear will not necessarily support a claim of sudden passion, but that fear that "rises to the level of 'terror'" will suffice (if the cause is adequate) to invoke an instruction on the issue. The appellant counters that, taking his "bare claim" of fear in context of the totality of the circumstances surrounding the confrontation between the two men, a jury could reasonably infer both that the appellant experienced sufficient fear to cause him to lose the capacity for cool reflection, and that Johnson's conduct was adequate to induce such an emotional state in a man of ordinary temperament. According to the appellant, because there was some evidence to support the appellant's contention that he "was in the grip of 'passion'" when he shot Johnson, the trial court should have given the instruction. We conclude that, in any event, whatever error the trial court may have committed by failing to charge the jury with respect to sudden passion did not harm the appellant. Finding our harm analysis thus dispositive, we need not address whether the trial court did, in fact, err not to include the instruction.

*Id.* at 606-07 (footnotes and citations omitted).

We likewise find our harm analysis dispositive; therefore, we also need not address whether the trial court erred in excluding the sudden-passion instruction.

As was done in *Wooten*, we examine the state of the evidence and the record as a whole, "with an eye toward determining the likelihood that the jury would have accepted the appellant's sudden passion claim." *Id.* at 608 n.38. Like *Wooten*, Grba's "self-defense claim boiled down to whether the jury would accept that, when he shot at [Carroll], he reasonably believed that deadly force was immediately necessary to protect himself from [Carroll's] use of deadly force." *Id.* at 609. *Wooten* involved a mutual gun battle. *Id.* In this case, it is not disputed that Carroll shot and wounded Allen in the leg with Grba standing near Allen and that Carroll emptied the clip in his Glock 9 mm. handgun. But

in rejecting Grba's self-defense claim, "the jury simply did not believe his claim that he reasonably believed deadly force was immediately necessary." *Id.*

> To reach this conclusion, the jury must have rejected the inference … that [Carroll], not [Grba], fired first. This is because, had the jury in fact believed that [Carroll] fired first, as [Grba] contended, there would have been no impediment to a finding that [Grba] reasonably believed it was immediately necessary to meet [Carroll's] deadly force with justifiable deadly force of his own. Under these circumstances, the jury would almost certainly have acquitted [Grba] based on his self-defense claim. But it did not.

> It is highly unlikely that a jury that had already rejected [Grba's] claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion. To prove sudden passion, [Grba] would have had to establish, *inter alia*, 1) that he actually acted under the influence of a fear so great that it caused him to lose his capacity for cool reflection, and 2) that [Carroll's] actions were adequate to produce such a degree of fear in a man of ordinary temperament. But a jury that had already discredited [Grba's] claim that he reasonably believed deadly force to be immediately necessary would be unlikely to believe that, at the time [Grba] first fired, he was actually experiencing a level of fear that caused him to lose control. Moreover, even had the jury believed that [Grba] subjectively experienced such a level of fear, it would not likely have found that [Carroll's] behavior presented a provocation adequate to produce such a degree of fear in a man of ordinary temperament. Based on the record and evidence before us, it is exceedingly unlikely that [Grba] suffered "some harm" as a result of the trial court's failure to give the jury a sudden passion instruction based on [Grba's] assertion that terror or fear controlled his actions.

*Id.* at 609-10 (footnotes and citations omitted). We therefore overrule issue one in the murder case.

Issue two in the murder case and issue one in the other two cases identically assert that the trial court abused its discretion in the punishment phase by overruling Grba's objections to the admission of extraneous-offense evidence, which was that Grba had committed the uncharged offenses of kidnapping and aggravated sexual assault in 2007.

Grba's objections in the trial court were that he was being denied his confrontation right because the alleged victim was not going to testify and that the probative value of the evidence was outweighed by its unfair prejudice (Rule of Evidence 403).

Section 3(a) of Article 37.07 of the Code of Criminal Procedure grants trial courts broad discretion to admit evidence of extraneous crimes or bad acts during the punishment phase. The relevant statutory language is:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (West Supp. 2014).

Grba's specific complaint on appeal is that the trial court abused its discretion because the State's extraneous-offense evidence was insufficient for the trial court to infer that Grba was criminally responsible for the extraneous offenses beyond a reasonable doubt. *See Huizar v. State*, 12 S.W.3d 479, 482 (Tex. Crim. App. 2000) ("at punishment the reasonable-doubt standard is applicable in deciding whether or not to consider certain evidence in assessing the sentence (a statutory requirement)"). The State correctly points out that Grba's complaint on appeal does not comport with his objections in the trial court.

To preserve a complaint for appellate review, a complaining party must make a timely and specific objection in the trial court. *See* TEX. R. APP. P. 33.1(a)(1); *Wilson v. State*,

71 S.W.3d 346, 349 (Tex. Crim. App. 2002). The complaint on appeal must correspond or comport with objections and arguments made at trial. *Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1999); *see Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd). "Where a trial objection does not comport with the issue raised on appeal, the appellant has preserved nothing for review." *Wright*, 154 S.W.3d at 241; *see Resendiz v. State*, 112 S.W.3d 541, 547 (Tex. Crim. App. 2003) (holding that an issue was not preserved for appellate review because appellant's trial objection "does not comport with" the issue he raised on appeal); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (same).

Grba's complaint in these three appeals (issue two in the murder case and issue one in the other two cases) about the extraneous-offense evidence not meeting the beyond-a-reasonable-doubt standard was not made in the trial court. These three issues present nothing for review and are thus overruled.

Issue three in the murder case and issue two in the other two cases allege that Grba's trial counsel was ineffective for failing to make a hearsay objection in the punishment phase when the State offered evidence pertaining to the above-referenced extraneous offenses. Specifically, no hearsay objection was made when the State elicited testimony from a sheriff's department investigator that the alleged victim had told her that more than one person had been involved in the alleged offenses of kidnapping and aggravated sexual assault.

The United States Constitution, the Texas Constitution, and article 1.051 of the Code of Criminal Procedure guarantee an accused the right to reasonably effective

assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.051 (West Supp. 2010); *see also Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997). To prove ineffective assistance of counsel, Grba must show that: (1) trial counsel's representation fell below an objective standard of reasonableness, based on the prevailing professional norms; and (2) there is a reasonable probability that, but for trial counsel's deficient performance, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687-95, 104 S.Ct. at 2064-69; *Dewberry v. State*, 4 S.W.3d 735, 737 (Tex. Crim. App. 1999). Whether this test has been met is to be judged on appeal by the totality of the representation, not by isolated acts or omissions. *Rodriguez v. State*, 899 S.W.2d 658, 665 (Tex. Crim. App. 1995). Grba has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Cannon v. State*, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984)).

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if Grba overcomes the strong presumption that his counsel's conduct fell within the range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. The right to "reasonably effective assistance of counsel" does not guarantee errorless counsel or counsel whose competency is judged by perfect hindsight. *Saylor v. State*, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). Moreover, the acts and omissions that form the basis of Grba's claims of ineffective assistance must be supported by the record. *Thompson*, 9 S.W.3d at 814. A silent record that provides no

explanation for counsel's actions usually will not overcome the strong presumption of reasonable assistance. *Id.* at 813-14. To warrant reversal without affording counsel an opportunity to explain his actions, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'" *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

Here, Grba did not raise the issue of ineffective assistance of counsel in his motions for new trial. Thus, his trial counsel was not afforded an opportunity to explain his trial strategy or address the complaint that Grba makes on appeal. In situations where trial counsel has not been afforded an opportunity to explain his actions, an appellate court will usually reject the complaint in a summary fashion. *See Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004); *Hervey v. State*, 131 S.W.3d 561, 564 (Tex. App.—Waco 2004, no pet.) ("[T]rial counsel should ordinarily be afforded an opportunity to explain the actions taken or not taken, as the case may be, before being condemned as unprofessional and incompetent."). Because the record is silent as to trial counsel's trial strategy and because Grba has not adequately explained how trial counsel's actions were so outrageous that no competent attorney would have engaged in them, we cannot say that the record supports a finding that trial counsel was ineffective. *See Roberts*, 220 S.W.3d at 533. We overrule Grba's third issue in the murder case and his second issue in the other two cases.

Having overruled all of the issues in each appeal, we affirm the trial court's judgment in each case.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
     (Chief Justice Gray concurs with a note)*
Affirmed
Opinion delivered and filed August 27, 2015
Do not publish
[CRPM]

*(Chief Justice Gray concurs in the Court's judgments to the extent they affirm the trial court's judgments.  A separate opinion will not issue.)

