**Reverse and Remand and Opinion Filed November 12, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00098-CR

**JAMES BERKELEY HARBIN II, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-9122107-Q**

## MEMORANDUM OPINION

Before Justices Whitehill, Partida-Kipness, and Pedersen, III
Opinion by Justice Pedersen, III

A jury sentenced appellant James Berkeley Harbin II to twenty-four years' confinement in the Institutional Division of the Texas Department of Criminal Justice. He appeals that sentence, arguing in a single issue that the trial court erred by failing to include a sudden passion mitigation instruction in the jury charge. We reverse the trial court's judgment and remand this case for a new punishment hearing.

### BACKGROUND

This appeal comes to us more than twenty-five years after appellant was convicted of murdering his father, James Berkeley, Sr. (James Senior). Appellant was sixteen years old at the time of the murder. A jury found him guilty in 1991, and jurors assessed his punishment at life in

prison. This Court affirmed his conviction. *Harbin v. State*, No. 05-91-00621-CR, 1992 WL 186257, at *1 (Tex. App.—Dallas Aug. 6, 1992, pet. ref'd).

Appellant filed an application for a writ of habeas corpus, and, in 2015, the Texas Court of Criminal Appeals granted his request for a new punishment hearing and vacated his life sentence. *Ex Parte Harbin*, No. WR-82,672-01, 2015 WL 3540861, at *1 (Tex. Crim. App. June 3, 2015). In December 2017, following the new punishment hearing, the jury assessed his punishment at twenty-four years.[1] This appeal followed.

### The Writ Proceedings

The proceedings surrounding appellant's writ application, *see* TEX. CODE CRIM. PROC. ANN art. 11.07, necessarily weigh on our review of the 2017 sentence. The trial judge to whom appellant's application was assigned held an evidentiary hearing over six days. Ten witnesses gave live testimony, and more than twenty affidavits and exhibits were offered. Appellant argued that the State had withheld exculpatory evidence at his trial that would have been mitigating in the punishment phase. He also argued that his trial counsel had failed to investigate mitigating evidence and to present mitigating evidence to the jury. The writ court agreed. It found that the withheld and unpresented evidence fell into two general categories:

1. Serious mental and psychological problems that his father suffered from, and how these problems affected [appellant] and his family.

2. The father's violent and abusive nature, and how this affected [appellant] and his family.

The court went on to detail evidence presented at the hearing that established both appellant's father's serious mental health conditions and his violent and abusive nature. The court found that the evidence provided an explanation as to why appellant killed his father and would most likely have led to a different outcome had it been presented to the original jury.

---

[1] The jury learned during the hearing that appellant had already served twenty-four years of his life sentence.

The court then concluded that the State had suppressed exculpatory, mitigating evidence that was material to appellant's trial, resulting in his not receiving a fair trial. The court concluded further that appellant received ineffective assistance of counsel at his original trial. Thus, the trial court's ultimate conclusion was that "whether it be by suppression of exculpatory evidence or by ineffective assistance of counsel, had the [original] jury heard the evidence that was presented at the writ hearing, they would have assessed a sentence of substantially less than life." The trial court recommended that the requested relief—a new punishment hearing—be granted.

The Court of Criminal Appeals reviewed the record of the writ hearing and concluded that the trial court's findings and recommendation to grant relief were supported by the record. It granted appellant's request for a new punishment hearing and vacated his life sentence. *Ex Parte Harbin*, 2015 WL 3540861, at \*1.

## The New Punishment Hearing

During the punishment hearing below, appellant presented similar testimony to that presented at the writ proceedings.[2] Along with his own testimony, he offered testimony from his family, from longstanding friends of his family, and from a forensic psychologist. We relate some of the facts and opinions that were presented by these witnesses, in summary fashion:

- Wesley Gardner, a high-school friend of appellant's, related an incident in which appellant arrived home late and his father struck him with a broomstick as he came through the door. Appellant's father also appeared at a graduation party brandishing a gun and announcing that he was going to do "target practice" in the pasture next to appellant's mother's house.

- Julie Badii, appellant's sister, testified that their father was under psychiatric care and had a "sea of prescription bottles." Her father threatened to burn down the house where Badii

---

[2] We relate the testimony offered by appellant's witnesses because our review must focus on evidence supporting the requested instruction, not evidence refuting it. *Trevino v. State*, 100 S.W.3d 232, 238–39 (Tex. Crim. App. 2003).

lived with their mother and step-father. He called appellant derogatory names and was sometimes violent toward appellant: once, with no provocation, her father backhanded appellant at the kitchen table.

- Candace Harbin, also appellant's sister, testified that as their father got older, his behavior became "more and more stressed." When he was depressed, he would lay in bed for months at a time; he eventually took medical retirement because he could not function. Then at other times he would go into a rage that no incident had set off, and he would abuse appellant physically and emotionally. She also testified to the unprovoked "kitchen table incident," describing a backhand blow that sent appellant airborne into the next room. More often, she heard rather than saw her father's violence toward appellant when James Senior dragged appellant into the garage. Harbin testified that she "always thought one of em's gonna end up dead. If my brother's dead, my dad killed him. If my dad's dead, my brother . . . one of 'em killed the other." Candace confirmed that her father's unprovoked abuse toward appellant continued up to the time of the killing.

- Ginger Cole, appellant's mother, testified concerning James Senior's mental health history, which included rounds of electro-shock therapy punctuating significant depression. She explained that his condition was degenerative and that his temper flare-ups became more violent as time went on. She testified that he stalked and terrorized her after they were divorced and she remarried: he made threats against both her and her second husband; every month or two, he would call her and threaten to kill them both or to burn their house down; he would park outside their house, follow them, and harass them on the road. Appellant was aware of all these threats, and she feared for appellant's life because James Senior threatened him as well. She described James Senior as angry, livid, and out of control. She testified that the murder was her worst nightmare; "it was like two trains

coming down the track, and one of 'em was gonna be dead, and I just didn't know which one."

- Doctor Randall Price, a board-certified forensic psychologist testified as well. He examined appellant while he was incarcerated. He reviewed the police records, the original trial testimony, and a letter from the psychiatrist who had treated James Senior through the 1970s and 80s. Dr. Price opined that James Senior "was certainly psychiatrically disturbed in more than one way" and that his violent conduct was largely a product of his mental problems. He believed that James Senior suffered from depression and probably from a bipolar disorder that worsened over time. He believed that appellant was a victim of very significant child abuse and that he suffered from abused or battered child syndrome. He explained why such a child or adolescent could kill:

> Their perception is they don't have any other way to cope with this, that they feel trapped, out of control, not able to conceive of any other avenue to, not only prevent the ongoing abuse to them, but in many cases, such as the one we have here today, to protect their family. And that is tied partly to adolescence and the cognitive capacity of an adolescent and partly to the situation where they try to do other things, and it doesn't work.

> And so, they, as a result of the long term abuse towards them and their families, they become to the point that they feel helpless to change the situation, and they see no other way to end the abuse from their perspective.

Dr. Price testified that appellant fit the pattern of a young offender who killed as a result of chronic physical and emotional abuse.

- Finally, appellant testified at the new punishment hearing. He described many of the same incidents that his family had related. And he confirmed that his father had become more and more violent and threatening—both to appellant and to his mother—as time passed. He stated that this continuing abuse made him distrustful and extremely angry. He believed that one day his father would carry out his threats

to kill him and his mother. He testified to what happened the night of the shooting. He wanted to tell his father he had dropped out of school, and, as he expected, his father was very angry. As appellant explained he had wanted to leave school for a long time, his father blamed appellant's mother, saying she was behind this. When appellant explained that he had not seen his mother that day and had been with his girlfriend, his father made an extraordinarily vulgar comment about appellant's girlfriend, his mother, and his sister. Appellant responded by getting his gun from the car and shooting his father. When asked why, he said "it was apparent that this dude was not gonna stop and not gonna stop." He testified that it was not in his mind before the comment to kill his father.

Ultimately, the jury assessed appellant's punishment at twenty-four years' confinement. This appeal followed.

## THE SUDDEN PASSION INSTRUCTION

Appellant's counsel objected below to the trial court's failure to instruct the jury on the appropriate mitigation of penalty if appellant caused his father's death under the immediate influence of sudden passion arising from an adequate cause. *See* TEX. PENAL CODE ANN. § 19.02(d).[3] Appellant's single issue in this Court complains of the trial court's overruling that objection.

We review a trial court's decision not to submit an instruction in the jury charge for an abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 121–22 (Tex. Crim. App. 2000). That review involves a two-step analysis. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). First, we ask whether error exists in the charge. *Id.* at 743. Second, if error does exist, we

---

[3] If appellant's conduct met those criteria, he would be punished within the range prescribed for a second-degree felony rather than a first-degree felony. *Id.*

determine whether sufficient harm resulted from the error to require reversal. *Id.* at 744. When, as here, the defendant objects to the charge error, we must reverse if we conclude the error caused "some harm" to his rights. *Id* at 743 (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).

## Did Appellant Preserve His Complaint?

The State contends as a threshold matter that appellant did not preserve his complaint of the court's failure to give a mitigation instruction. It contends that "Appellant did not argue to the trial court that the current murder statute as amended in 1994 controls the trial court's obligation to include a sudden passion instruction in a punishment re-trial from a 1991 murder conviction." We disagree. As the State correctly quotes in its brief, appellant objected at the charge conference below stating:

> I object to the Court's charge for failing to instruct the jury on what we used to call the law of voluntary manslaughter. It's now in our penal code contained in mitigation of penalty in the -- in the actual murder statute where if there is indication that the defendant caused the death of the deceased under the immediate influence of sudden passion arising from that cause, the punishment range is changed from 5 to 99 or life and a fine [to] 2 to 20 and a fine. So I would like to have that, and I object to the omission of that from the Court's charge.

There can be no question that appellant's objection is based upon the former statute's voluntary-manslaughter concept of the immediate influence of sudden passion, which—appellant points out—is found in the current murder statute and operates in mitigation of punishment. Appellant preserved this complaint for our review.

## Did Sufficient Evidence Support Giving the Instruction?

"[A] sudden passion charge should be given if there is some evidence to support it, even if that evidence is weak, impeached, contradicted, or unbelievable." *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). This rule applies regardless of what the trial court may think about the credibility of the evidence; in that way we ensure that the jury, not the judge, decides the

credibility of the evidence. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006). Therefore, if there was some evidence that appellant caused his father's death under the immediate influence of sudden passion arising from an adequate cause, PENAL § 19.02(d), jurors should have been instructed that they could consider that fact in assessing appellant's punishment. As we noted above, our proper focus is on evidence supporting the instruction, not evidence refuting it. *Trevino*, 100 S.W.3d at 238–39.

*Evidence of Adequate Cause*

The Penal Code defines "adequate cause" to mean "[a] cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). In this case, appellant produced evidence of the mental and psychological problems that his father suffered from as well as his father's violent and abusive nature. The evidence indicated that James Senior terrorized his son and his ex-wife with death threats. And the evidence shows that he grew more and more violent as time passed. Appellant conceded that the continued abuse made him distrustful and "extremely angry." We conclude that ample evidence existed of James Senior's conduct producing "a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.*

*Evidence of Sudden Passion*

The Penal Code also defines "sudden passion," which is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." PENAL § 19.02(a)(2). Here, appellant described his father's lascivious remark concerning appellant's sister, mother, and girlfriend. He testified that he believed at that moment that his father's abuse was never going to stop. This reaction is consistent with Dr. Pierce's expert testimony that a

battered adolescent may kill because he perceives he has no other way to cope with the abuse to himself and his family. We conclude that appellant's testimony was some evidence of a contemporaneous passion directly caused by and arising out of his father's provocation. *See id.*

**Should the Amended Murder Statute Have Applied in Appellant's New Punishment Trial?**

The State contends that, regardless of whether evidence supported the sudden passion instruction, appellant was not entitled to it because his first jury was permitted to consider this issue when it determined his guilt for murder. The fundamental flaw in the State's argument is that the first jury was not permitted to hear the evidence that would have supported that instruction: as the writ proceedings established, the State withheld mitigating evidence and appellant's counsel failed to discover and present mitigating evidence. We cannot agree, therefore, that appellant had this issue fairly decided in his first trial.[4]

The State acknowledges that the law changed in 1994, when the sudden passion issue became a matter for the trier of fact to consider at the punishment phase rather than at guilt/innocence. But the State argues that the revised murder statute did not apply at appellant's new punishment hearing because the 1994 amendment worked a substantive change in the law, not a procedural one. Again, we disagree. Courts classify statutory amendments as substantive or procedural by looking at the changes that occur as a result of the amendment. *Ex parte Scales*, 853 S.W.2d 586, 588 (Tex. Crim. App. 1993). An amendment is procedural if it works a change in the procedures by which a criminal case is adjudicated. *Id.* An amendment is substantive if it defines criminal acts or provides for penalties. *Ex parte Johnson*, 697 S.W.2d 605, 607 (Tex. Crim. App. 1985). A procedurally amended statute controls litigation from its effective date and applies to pending actions, not only to those filed after its effective date. *Id.* at 608.

---

[4] For this reason we also reject the State's argument that the doctrine of collateral estoppel bars this instruction in appellant's case. Before the bar of collateral estoppel can be applied, there must have been a full hearing, at which the parties had an opportunity to litigate the issue "thoroughly and fairly." *State v. Aguilar*, 947 S.W.2d 257, 259 (Tex. Crim. App. 1997). Application of collateral estoppel to this issue would reward the State for withholding evidence at the first trial.

In this case, the parties cite the same law, but reach opposing conclusions as to the character of the 1994 amendment. We acknowledge that the re-drawing of the law of voluntary manslaughter as a rationale for punishment mitigation does not lend itself to simplistic categorization. Section 10.02(d) does not define a criminal act. But it does provide for a change in penalty under certain circumstances: proof of sudden passion by a preponderance of the evidence changes murder from a first-degree felony to a second-degree felony. PENAL § 19.02(d) ("If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a *felony of the second degree*.") (emphasis added). This amendment, thus, does not fit neatly into the category of substantive change. *See Johnson*, 697 S.W.2d at 607. The amendment has changed the procedures by which a murder case is adjudicated: the identical issues of sudden passion and adequate cause are now tried in a different phase of trial, and the parties' burdens of proof are reversed. PENAL § 19.02(d) ("At the *punishment stage* of a trial . . . . [i]f *the defendant proves* the issue in the affirmative . . .") (emphasis added). If we must categorize the 1994 amendment, then, we conclude it represents more of a procedural change than a substantive one.

Our resolution, however, turns on more than attempts to impose uncertain labels on legislative changes. The court of criminal appeals concluded that appellant's original trial was marred by ineffective assistance of his trial counsel and *Brady* violations by the State. *Ex Parte Harbin*, 2015 WL 3540861, at *1. Appellant's trial counsel failed to investigate or present evidence that directly related to appellant's argument that he committed voluntary manslaughter, and the prosecutor failed to disclose evidence directly relating to voluntary manslaughter. The concepts underlying the offense of voluntary manslaughter—sudden passion and adequate cause— have now moved intact from the guilt/innocence phase of trial to the punishment phase. *See, e.g., Perez v. State*, 940 S.W.2d 820, 822 (Tex. App.—Waco 1997, no pet.) ("The current definitions of sudden passion and adequate cause are identical to those set forth in the former voluntary

manslaughter statute."). Thus, the only material change in appellant's opportunity to present this mitigation evidence since his original constitutionally defective trial and the trial from which he now takes direct appeal, concerns the phase at which such evidence can be admitted. In 1991, this issue was decided by the jury in the guilt/innocence phase, but it was decided without the relevant mitigating evidence being presented to the jury. As a result, that proceeding violated appellant's right to due process, making his trial so unfair that he deserved a new one. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (question when government suppresses evidence is whether, in its absence, defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence"). We conclude that when the trial court denied appellant the opportunity to have a jury fairly consider the sudden passion issue in his new punishment hearing, he was again deprived of a fair trial.

Justice requires that appellant have a new punishment hearing. The reasons he was granted a new punishment hearing were based on the exclusion of evidence the writ courts concluded would have been mitigating. Those courts, and appellant's able writ counsel, were certainly aware that Texas law currently makes such mitigation a punishment issue. The writ trial court recommended, and the court of criminal appeals granted, a new punishment hearing so that the mitigating evidence could be produced to a jury. We are confident that those bodies intended to provide appellant a vehicle wherein the wrong he had suffered could be remedied. Fine distinctions of "procedural" and "substantive" changes to the law must yield to the protections of the Fourteenth Amendment. *See, e.g.*, *Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex. Crim. App. 1997) (when violation of accused's due process right to a fair trial undermine confidence in the trial's outcome, remedy prescribed is reversal of conviction and remand for further proceedings).

We conclude that the trial court erred by refusing to give the jury the requested instruction on sudden passion.

**Was Appellant Harmed by Omission of the Sudden Passion Instruction?**

Because appellant timely objected at trial to the jury charge error, we must reverse upon a showing of "some harm" to him as a result of the denial of the sudden passion instruction. *See* TEX. R. APP. P. 44.2. The State argues that appellant suffered no harm because the jury's sentence mirrored the time he had already served, twenty-four years. Appellant correctly notes that—if he had been given the instruction and the jury had found sudden passion by a preponderance of the evidence—then the longest sentence he could have received would have been twenty years. This distinction is certainly important, but merely acknowledging the different punishment ranges is insufficient to show harm in this context. *See Trevino*, 100 S.W.3d at 241.

Appellant asked the jury to assess his punishment at probation in order to have his civil rights fully restored. The State argued repeatedly that this "was not a probation case." It is fair to say that jurors could not make an informed choice between those alternative views of this case without understanding that the evidence of James Senior's serious mental and physical health problems, his violent and abusive nature, and the effect those conditions had upon appellant and his family, could affect the extent of the punishment they were to assess.[5]

The State speculates that jurors "considered [that] mitigating punishment evidence" because of the twenty-four-year sentence they assessed. Of course we cannot know that. But even if the State's speculation were accurate, our concern is that the jury was not guided in *how* to consider that evidence. While jurors may have been sympathetic toward appellant after hearing the evidence, they were not told that the law treated that evidence as relevant in terms of applicable

---

[5] For example, if jurors are told the punishment range for an offense extends to 99 years or life in prison, they may view a request for probation as beyond the pale. But if instructed that a sudden passion finding lowers the maximum punishment to 20 years, probation may seem a more reasonable request, especially when it comes from someone who has already served more than the maximum punishment permitted.

punishment. The pattern jury charge for this defense envisions a lengthy, detailed explication of the law of sudden passion, culminating in a special issue, the answer to which controls the punishment range the jury is to apply.[6] If given the entire instruction envisioned in the note below, jurors would have understood that the law views a murder committed under sudden passion differently from one not committed under that condition.

---

[6] SPECIAL ISSUE

Now, having found the defendant guilty of the offense of murder, you must determine by a preponderance of the evidence whether or not the defendant caused the death under the immediate influence of sudden passion arising from an adequate cause.

"Adequate cause" means a cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

"Sudden passion" means passion directly caused by and arising out of provocation by the individual killed, or another acting with the person killed, which passion arises at the time of the offense and is not solely the result of former provocation.

The burden of proof is by a preponderance of the evidence, and that burden rests on the defendant. The term "preponderance of the evidence" means the greater weight of the credible evidence.

Now, bearing in mind the foregoing instructions, if you believe the defendant proved by a preponderance of the evidence that the defendant, AB, having committed the offense of murder, caused the death of CD under the immediate influence of sudden passion arising from an adequate cause, you must make an affirmative finding as to the special issue, and the punishment you must assess is by confinement in the Texas Department of Criminal Justice for any term of not more than twenty years or less than two years. In addition, a fine not to exceed $10,000.00 may be imposed.

But, if you do not believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, caused the death of CD under the immediate influence of sudden passion arising from an adequate cause, you must make a negative finding as to the special issue, and the punishment you must assess is by confinement in the Texas Department of Criminal Justice for life or for any term of not more than ninety-nine years or less than five years. In addition, a fine not to exceed $10,000.00 may be imposed.

Do you, the Jury, find by a preponderance of the evidence that the defendant caused the death of CD under the immediate influence of sudden passion arising from an adequate cause?

(The Jury will answer either "We do" or "We do not.")

ANSWER: _____

_____

PRESIDING JUROR

CHOOSE ONE

We, the Jury, having found the defendant guilty of murder and having made a negative finding to the special issue, assess his punishment at confinement in the Texas Department of Criminal Justice for _____ (life or any term of years 5-99).

In addition, we assess a fine of (up to $10,000) (fine optional).

_____

PRESIDING JUROR

OR

We, the Jury, having found the defendant guilty of murder and having made an affirmative finding to the special issue, assess her punishment at confinement in the Texas Department of Criminal Justice for _____ for _____ (2-20).

In addition, we assess a fine of _____ (up to $10,000) (fine optional).

_____

PRESIDING JUROR

TEX. CRIM. JURY CHARGES § 3:2080 (2018).

Of course this form is intended for a jury that has itself made the finding of guilt on a murder charge, but it could easily be tailored to the procedural history of this case.

We must make our own assessment as to whether harm occurred. *See Trevino*, 100 S.W.3d at 241. "To assay harm, we focus on the evidence and record to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction." *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). We cannot be certain. But, given the evidence at this trial, we conclude that jurors would likely have found that appellant acted out of sudden passion arising out of an adequate cause. We conclude appellant suffered some harm from the trial court's refusal to give the requested sudden passion instruction. *See* TEX. R. APP. P. 44.2.

We sustain appellant's single issue.

### CONCLUSION

We reverse the trial court's judgment and remand this case for a new punishment hearing.

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

180098f.u05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JAMES BERKELEY HARBIN II,
Appellant

No. 05-18-00098-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-9122107-Q.
Opinion delivered by Justice Pedersen, III.
Justices Whitehill and Partida-Kipness
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause **REMANDED** for a new punishment hearing.

Judgment entered this 12th day of November, 2019.