

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1437-12

### CODIEM RENOIR WOOTEN, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

**PRICE, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

A jury rejected the appellant's self-defense claim, convicted him of murder, and assessed his punishment at sixty years' confinement in the penitentiary. At the punishment phase of the trial, the appellant requested a sudden passion instruction. The trial court denied his request, and the Fourteenth Court of Appeals affirmed the appellant's conviction but reversed the trial court's judgment with respect to punishment, finding that the trial court

erred by not giving the sudden passion instruction and that the error was "harmful."[1] According to the court of appeals, the mere fact that the jury might have found in the affirmative on the sudden passion issue, subjecting him to a maximum sentence of only twenty years' imprisonment, was alone enough to conclude that the appellant had been harmed.[2] We granted the State's petition for discretionary review to examine both the court of appeals's error and harm analyses. We reverse the judgment of the court of appeals with respect to punishment.

## FACTS AND PROCEDURAL HISTORY

### In the Trial Court

The appellant was indicted for murder.[3] On the evening of August 29, 2009, the victim, Kwasi Johnson, went with Derrick London to a Houston strip club called Gator's. At some point during that same evening, the appellant and his two "girlfriends," one being Brandi Cleveland, also arrived at Gator's. Cleveland, a prostitute, began approaching men in Gator's to offer her services. She eventually approached Johnson and London, and Cleveland offered to have sex later that night with the two men for the agreed rate of two hundred and forty dollars.

---

[1] *Wooten v. State*, 378 S.W.3d 652, 657 (Tex. App.—Houston [14th Dist.] 2012).

[2] *Id.* ("If the jury had determined that [the appellant] acted out of sudden passion, the offense would have been reduced to a felony of the second degree, which carries a maximum sentence of 20 years. *See* Tex. Penal Code § 19.02(d).").

[3] TEX. PENAL CODE § 19.02(b)(1) & (2).

During the early morning hours of August 30, 2009, Johnson called Cleveland in order to arrange to pick her up for "the date." Johnson and London picked Cleveland up from the home she shared with the appellant and headed to Johnson's apartment. Once they arrived at the apartment, London left Johnson and Cleveland, and Johnson then attempted to negotiate a lower price. Cleveland refused the counteroffer, and Johnson offered to drive her home. In the car, Cleveland notified the appellant that Johnson was bringing her home and that "the date" was a "no-go," alerting the appellant that Johnson had not delivered payment. When they arrived, Johnson brought the car to a halt and Cleveland got out, leaving the front passenger door open. As Cleveland walked up the path to the house, the appellant approached her and confirmed that the deal was a "no-go." The appellant then continued down the path to Johnson, who was sitting in the car.

At trial, the appellant testified to the events leading up to the shooting and claimed that he acted in self-defense. Upon approaching Johnson's vehicle, the appellant noted that Johnson had placed a gun on the console. As the conversation between the men turned to why "the date" did not happen and why Johnson did not pay Cleveland, Johnson's demeanor became more combative. According to the appellant, he "[h]eard frustration in [Johnson's] voice[,]" Johnson began to speak in a "heightened tone[,]" and Johnson began to display a sort of "aggressiveness" in his speaking. The appellant claimed that, when he pressed Johnson, asking him to give Cleveland something for her time, Johnson told the appellant, "fuck you, fuck that bitch, everything you stand for, I'll kill you."

A firefight ensued. The appellant's description at trial as to who commenced the shooting was somewhat inconsistent. On direct examination, he testified 1) that Johnson shot him in the abdomen as he was reaching for his gun; 2) that Johnson shot him before he reached for his gun; and 3) that he reached for his gun when he saw the muzzle flash coming from Johnson's car. When the prosecutor confronted the appellant with these three variations on cross-examination, the appellant maintained, "I felt the shot as I was reaching for my handgun." Asked why he shot Johnson, the appellant replied, "Because I felt threatened for my life, sir. I felt it was self-defense. I felt I was righteous." Johnson's car and body were found nearby with his handgun still inside the car. The appellant conceded that in his initial interview with the police, he had failed to tell the police that he acted in self-defense, had a gun, or shot the victim; instead, he had fabricated a story about being the victim of a drive-by shooting.

Cleveland, the only other eyewitness to the gun battle, gave testimony that largely substantiated the appellant's description. She testified that she stood close enough to Johnson's and the appellant's conversation to have heard it. However, according to her testimony, she "really wasn't paying attention the whole time" and was mostly focused on her phone. But, after hearing gunshots, she glanced over in time to see a "muzzle flash" coming from inside of Johnson's car, while simultaneously seeing the appellant raise his arm. While ballistic experts and investigators from the Houston Police Department confirmed that a gun battle took place, in which both men fired multiple shots, none could say which party

fired first. After the close of evidence, the jury was instructed on the law regarding self-defense. However, it found the appellant guilty of murder, necessarily rejecting the appellant's self-defense claim.

The appellant elected to proceed to the jury for the punishment phase of the trial. After both sides presented punishment evidence, but before closing arguments, defense counsel and the trial judge had the following exchange regarding the submission of a sudden passion instruction to the jury:

> [DEFENSE COUNSEL]: I would request a charge on sudden passion . . . specifically that [the appellant] stated that once the shooting began that he was overwhelmed by emotions of fear.
>
> THE COURT: Once his shooting began?
>
> [DEFENSE COUNSEL]: Once the shooting began, that he was overwhelmed by emotions of fear, disorientation, confusion, et cetera. And, [Y]our Honor, I would argue that this would substantiate the charge.
>
> * * *
>
> THE COURT: . . . Obviously the self-defense has been rejected by the jury so - - I just don't see it. I'm going to deny that.

In the absence of a sudden passion instruction, which would have capped the available punishment at twenty years' confinement, the jury assessed punishment at 60 years in the penitentiary.

### In the Court of Appeals

The court of appeals reversed the trial court's judgment with respect to punishment

and remanded the cause to the trial court for a new punishment hearing.[4] After determining that the trial court erred not to grant the appellant's request to include a sudden passion instruction in the punishment phase jury instruction, the court of appeals next proceeded to determine whether the appellant had been harmed by the lack of the instruction.[5] Because the appellant expressly requested a sudden passion instruction, the court of appeals correctly concluded that the record need only demonstrate "some harm" to warrant reversal.[6] The appellate court then concluded that, "[i]f the jury had determined that [the appellant] acted out of sudden passion, the offense would have been reduced to a felony of the second degree, which carries a maximum sentence of 20 years."[7] Thus, the court of appeals found harm on the basis that the sudden passion instruction *could* have resulted in the jury finding that the appellant acted in sudden passion, authorizing a maximum punishment of no more than twenty years, without addressing the likelihood that the jury actually *would* have found that the appellant's behavior resulted from sudden passion on the facts of this particular case. We granted the State's petition for discretionary review to examine the court of appeals's holding.

---

[4] *Wooten*, *supra*, at 657-58.

[5] *Id*. at 657.

[6] *Id*. at 656-57 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (opinion on reh'g)).

[7] *Id*. at 657.

**THE LAW**

Prior to September 1, 1994, whether a defendant committed murder under the immediate influence of sudden passion arising from an adequate cause was an issue that was litigated at the guilt phase of the trial.[8] If the evidence raised the issue of sudden passion, the question was submitted to the jury, and it had the option of finding the defendant guilty of the lesser offense of voluntary manslaughter.[9] Because of certain anomalies generated by this framework,[10] the Legislature acted in 1993 to remove the crime of voluntary manslaughter from the Texas Penal Code.[11] Under the current statutory scheme, the question of whether a defendant killed while under the immediate influence of sudden passion is a punishment issue.[12]

Currently, a murder committed under the "immediate influence of sudden passion arising from an adequate cause" is a second-degree felony carrying a maximum punishment

---

[8]

*Trevino v. State*, 100 S.W.3d 232, 236 (Tex. Crim. App. 2003) (per curium).

[9]

*Id.*

[10]

*See Gold v. State*, 736 S.W.2d 685, 686 n.1 (Tex. Crim. App. 1987), *overruled in part on other grounds*, *Torres v. State*, 785 S.W.2d 824, 825 (Tex. Crim. App. 1989).

[11]

*See* Acts 1993, 73rd Leg., ch. 900, § 1.01, p. 3613, eff. Sept. 1, 1994; *Moore v. State*, 969 S.W.2d 4, 8 n.1 (Tex. Crim. App. 1998) (discussing the legislative change to move the issue of sudden passion from the guilt phase of the trial to the punishment phase).

[12]

*Id.*

of twenty years' imprisonment.[13]  Sudden passion is "passion directly caused by and arising out of provocation by the individual killed" which arises at the time of the murder.[14] Adequate cause is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."[15]  The defendant has the burden of production and persuasion with respect to the issue of sudden passion.[16]  To justify a jury instruction on the issue of sudden passion at the punishment phase, the record must at least minimally support an inference: 1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) that his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; 3) that he committed the murder before regaining his capacity for cool reflection; and 4) that a causal connection existed "between the provocation, passion, and homicide."[17]  It does not matter that the evidence supporting the submission of a sudden passion instruction may be weak, impeached,

---

[13] TEX. PENAL CODE § 19.02(d).

[14] TEX. PENAL CODE § 19.02(a)(2).

[15] TEX. PENAL CODE § 19.02(a)(1).

[16] TEX. PENAL CODE § 19.02(d).

[17] *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005).

contradicted, or unbelievable.[18] If the evidence thus raises the issue from any source, during either phase of trial, then the defendant has satisfied his burden of production, and the trial court must submit the issue in the jury charge—at least if the defendant requests it.[19]

When an appellant protests that the trial court erred not to grant his request to charge the jury regarding sudden passion, a reviewing court must first determine whether the complained-of error exists.[20] If the reviewing court agrees that a trial court erred by failing to submit a sudden passion instruction, it then analyzes whether the error harmed the appellant.[21] Harm does not emanate from the mere failure to include the requested

---

[18]

*Id.*; *Trevino*, *supra*, at 238-39.

[19]

*McKinney*, *supra*, at 569; *Trevino*, *supra*, at 238-39. This Court has yet to specifically address whether sudden passion is a defensive issue in contemplation of *Posey v. State*, 966 S.W.2d 57 (Tex. Crim. App. 1998). *See Rios v. State*, 990 S.W.2d 382, 384 (Tex. App.—Amarillo, no pet.) (holding that sudden passion is a defensive issue for *Posey* purposes). In *Posey*, we held that defensive issues are not "law applicable to the case" under Code of Criminal Procedure Article 36.14 unless and until the defendant raises the issue by a timely objection or request. TEX. CODE CRIM. PROC. art. 36.14. Because a defensive issue is not "law of the case," the trial judge has no duty to instruct the jury *sua sponte* regarding such an issue, and the failure to instruct cannot be regarded as fundamental error under *Almanza*. In the instant case, the issue of sudden passion became "law of the case" *at least* by virtue of the appellant's request for the instruction, if not otherwise. *See Trevino*, *supra*, at 242 & n.38 (analyzing the appellant's *Almanza* complaint regarding the lack of sudden passion instruction for "some harm," without specifying whether we regarded it as "law of the case" because Trevino had requested the instruction or, alternatively, because sudden passion is not a defensive issue in any event).

[20]

*See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003) (plurality opinion)).

[21]

*See Ngo*, *supra*, at 743; *Almanza*, *supra*, at 171.

instruction.[22]  A reviewing court undertakes a harm analysis by following the standards as set out in the Texas Code of Criminal Procedure Article 36.19.[23]  If the error is preserved, the record must demonstrate that the appellant has suffered "some harm."[24]  In an *Almanza* harm analysis, "burdens of proof or persuasion have no place[.]"[25]  Harm must be evaluated in light of the complete jury charge, the arguments of counsel, the entirety of the evidence, including the contested issues and weight of the probative evidence, and any other relevant factors revealed by the record as a whole.[26]  To assay harm, we focus on the evidence and record to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction.[27]

---

[22]

*Trevino*, *supra*, at 241.

[23]

*See* TEX.CODE CRIM. PROC. art. 36.19 ("Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial.").

[24]

*Trevino, supra*, at 242;  *Almanza*, supra*, at 171 (citing TEX. CODE CRIM. PROC. art 36.19).

[25]

*Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008).

[26]

*Almanza*, *supra*, at 171.  *See also Ellison v. State*, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002) (applying *Almanza* harm analysis to jury-charge error at the punishment phase of trial).

[27]

*Trevino*, *supra*, at 243.

## ANALYSIS

## Error

Relying on *Daniels v. State*,[28] the State argues that the trial court did not err by failing to include a sudden passion instruction because the appellant's assertion of a "bare claim of fear" at the trial level did not rise to the level of terror necessary to trigger a sudden passion instruction.[29] In *Daniels*, we explained that "a bare claim of" fear will not necessarily support a claim of sudden passion, but that fear that "rises to the level of 'terror'" will suffice (if the cause is adequate) to invoke an instruction on the issue.[30] The appellant counters that, taking his "bare claim" of fear in context of the totality of the circumstances surrounding the confrontation between the two men, a jury could reasonably infer both that the appellant experienced sufficient fear to cause him to lose the capacity for cool reflection, and that Johnson's conduct was adequate to induce such an emotional state in a man of ordinary temperament.[31] According to the appellant, because there was some evidence to support the appellant's contention that he "was in the grip of 'passion'" when he shot Johnson, the trial

---

[28] 645 S.W.2d 459, 460 (Tex. Crim. App. 1983).

[29] The appellant actually testified only that he "felt threatened." In requesting the sudden passion jury instruction, the appellant's counsel asserted that the evidence showed that the appellant had been "overwhelmed by emotions of fear." To fear is "to be afraid of." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 425 (10th ed. 1996). Terror, on the other hand, is "a state of intense fear." *Id*. at 1217.

[30] *Daniels*, *supra*, at 460.

[31] Appellant's Brief at 24-25.

court should have given the instruction.[32] We conclude that, in any event, whatever error the

trial court may have committed by failing to charge the jury with respect to sudden passion

did not harm the appellant.[33] Finding our harm analysis thus dispositive, we need not address

---

[32]

    *Id*. at 24.

[33]

    In his brief on discretionary review, the appellant at one point alludes to "both anger and fear." Appellant's Brief at 25. To the extent that this suggests that the evidence also raised "sudden passion" in the guise of "anger" or "rage," we hold that the trial court did not err by failing to submit the sudden passion instruction on that account. First, in his request for a sudden passion instruction before the trial court, the appellant mentioned "fear, disorientation, confusion, et cetera[,]" but never explicitly claimed anger. While the appellant mentioned anger in passing in his brief before the court of appeals, he did so only to make the point that being shot in the abdomen would constitute adequate cause to produce anger or terror in a person of ordinary temperament. He never claimed to have actually acted out of anger. Appellant's Brief on Direct Appeal at 33.

    Nor would the record support such a claim. At trial, the appellant all but denied having acted out of anger or rage when he shot Johnson. It is true that Cleveland initially told police that the appellant looked "angry like he wanted to fight someone[.]" When confronted with this statement at trial, she clarified that the appellant had not really been "angry at [the victim], but just about the situation." For his part, the appellant never identified anger as his motivating emotion, and he seems to have denied on cross-examination that it played any part in causing him to shoot Johnson:

    Q. Okay. But you heard [Cleveland], right? Same thing she told the police she told this jury, you looked like you were ready to fight that guy.

    A. I don't remember that, and I don't know nothing about that.

    Q. Okay.

    A. Had might I been upset? Yes, I was upset.

                    \* \* \*

    Q. You were sitting there when she got up there and said you were angry enough to fight that guy, weren't you?

    A. She didn't say that.

In *Daniels*, the accused testified that he shot the victim because he feared the victim was attempting

whether the trial court did, in fact, err not to include the instruction.[34]

## Harm

This is not our first occasion to address the question of how a jury's rejection of a self-defense claim bears on a reviewing court's *Almanza* harm analysis with respect to the erroneous denial of a sudden passion instruction. In *Trevino v. State*, upon which both the court of appeals and the appellant principally rely, a jury rejected Trevino's self-defense claim and convicted him of murder for killing his wife.[35] At the punishment phase of trial, Trevino requested a sudden passion instruction, but the trial court declined to include it in the jury charge.[36] We concluded that the trial court erred and turned to whether Trevino was

---

to kill him, but on cross-examination, he acknowledged that he had been "in full control and . . . knew [he] had to do what [he] did[.]" *Daniels*, *supra*, at 461. We held that Daniel's own assessment of the situation specifically refuted one of the elements required to raise sudden passion—that the actor lacked the ability for cool reflection. Here, similar to *Daniels*, the appellant acknowledged that he was "upset" with Johnson, but the source of his anger seems to have been Johnson's refusal to pay Cleveland—manifestly *not* an adequate provocation to cause a person of ordinary temperament to lose his capacity for cool reflection. He denied actually having experienced anger, much less any suggestion that he acted under the spell of that particular emotion when he shot Johnson. Instead, he simply claimed he shot Johnson in self-defense.

[34]    *See Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999) (in reviewing whether trial court erred by charging the jury on the law of parties, we "assume[d], without deciding, that error occurred and turn[ed] to the question of harm."). *See also Crenshaw v. State*, 378 S.W.3d 460, 464 (Tex. Crim. App. 2012) ("Because we hold that the first issue is dispositive, we need not reach the second issue."); *Moore v. State*, 371 S.W.3d 221, 225 (Tex. Crim. App. 2012) ("We do not address these two issues because the other two issues are dispositive of this appeal."); *Lakey v. State*, 364 S.W.3d 837, 839 (Tex. Crim. App. 2012) ("Finding our resolution of the second question dispositive, we need not address the first.").

[35]    *Trevino*, *supra*, at 236.

[36]    *Id.*

harmed by the absence of a sudden passion instruction.[37] In conducting a harm analysis, we did not explicitly invoke the four *Almanza* considerations.[38] Our inquiry simply focused on the likelihood that the jury would have found sudden passion based on the state of the record as a whole.[39] The record revealed two competing theories: 1) Trevino's assertion that he acted in self-defense, versus 2) the State's claim that Trevino intentionally killed his wife and subsequently staged the scene to appear as if he had acted only to protect himself.[40]

---

[37] *Id*. at 241.

[38] *Id*. at 241-43. As in *Trevino*, our analysis in the instant case centers on the state of the evidence and the record as a whole, with an eye toward determining the likelihood that the jury would have accepted the appellant's sudden passion claim. It is true that, in conducting a harm analysis under *Almanza*, we will typically also consider the jury charge as a whole as well as the arguments of counsel. *Almanza*, *supra*, at 171. Here, however, as in *Trevino*, neither the jury charge as a whole nor the arguments of counsel prove particularly informative. Nothing in the balance of the jury charge at the punishment phase served to ameliorate the fact that the issue of sudden passion was simply left out. And, in the absence of a sudden passion instruction, the parties had no occasion to argue the issue pro or con.

[39] *Trevino, supra*, at 241-43.

[40] Trevino attempted to paint a picture of a heated argument, followed by an intense struggle that ultimately culminated in his wife's death. He told the police that, on the day of the murder, his wife had become angry at him because she discovered slips of paper with other women's phone numbers in his wallet. *Id*. at 233. As her anger escalated, she pointed a .38 caliber revolver at him and pulled the trigger twice, but the gun failed to fire. *Id*. Trevino retreated to the bathroom to flush the offending slips of paper down the toilet and retrieved his 9 millimeter pistol. *Id*. When Trevino came out of the bathroom, his wife shot at him again—and this time her gun went off. *Id*. According to Trevino's statement, they struggled over the two guns, and two additional shots were fired that resulted in his wife's death. *Id*.

The State sought to portray a controlling and abusive husband who shot and killed his wife and then concocted a story of self-defense. To this end, the State adduced testimony that the crime scene did not match Trevino's claims, that a delay between his wife's death and a call to 911 allowed him and his family members, who arrived on the scene before the police, to cover his tracks, and that

Based on the record as a whole, we were unable to declare that, "had it received an instruction on sudden passion, the jury would not have made an affirmative finding on the issue[,]" and therefore, we could not say that Trevino did not suffer "some harm."[41] We explained that a jury could have rejected Trevino's self-defense claim and yet still have believed that he killed his wife in the heat of passion and staged the scene *afterward* to appear as though he acted in self-defense.[42] However, we did not discount the possibility that "[t]he evidence in a case in which a jury rejected a claim of self-defense could demonstrate also that the appellant was not harmed by the failure to receive a sudden passion charge[.]"[43] We think that this is such a case.

The success of the appellant's self-defense claim boiled down to whether the jury would accept that, when he shot at Johnson, he reasonably believed that deadly force was immediately necessary to protect himself from Johnson's use of deadly force. No other element of the self-defense claim was refuted by the evidence, which established without contradiction that a mutual gun battle took place. Moreover, the trial court specifically

---

family members had been observed carrying large black plastic bags from the home on the night of the murder. *Id*. at 233-35.

[41] *Id*. at 243.

[42] *Id*. at 242.

[43] *Id*. at 242 (citing *Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.—San Antonio 1999, pet. ref'd) (holding that when the State's evidence proved sufficient to negate self-defense, it also proved sufficient to show lack of harm in the trial court's failure to submit a sudden passion instruction)).

admonished the jury "not to consider whether the [appellant] failed to retreat." Therefore, the jury's rejection of the appellant's self-defense claim demonstrates that the jury simply did not believe his claim that he reasonably believed deadly force was immediately necessary.

To reach this conclusion, the jury must have rejected the inference, stemming from both the appellant's and Cleveland's testimony, that Johnson, not the appellant, fired first. This is because, had the jury in fact believed that Johnson fired first, as the appellant contended, there would have been no impediment to a finding that the appellant reasonably believed it was immediately necessary to meet Johnson's deadly force with justifiable deadly force of his own. Under these circumstances, the jury would almost certainly have acquitted the appellant based on his self-defense claim. But it did not.[44]

It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion. To prove sudden passion, the appellant would have had to establish, *inter alia*, 1) that he actually acted under the influence of a fear so great that it caused him to lose his capacity for cool reflection, and 2) that Johnson's actions were adequate to produce such a degree of fear in a man of ordinary

---

[44] We recognize that a jury could have disregarded the instruction that, if it believed that the appellant acted in self-defense, it was required to find him not guilty. The jury could have believed that the appellant acted in self-defense, ignored the instruction that required it to find him not guilty under those circumstances, and found him guilty anyway. However, we have said that "in the absence of evidence to the contrary, we will assume that the jury followed its written instructions." *Miles v. State*, 204 S.W.3d 822, 827-28 (Tex. Crim. App. 2006). Accordingly, we will assume that the jury followed the trial court's instructions and found the appellant guilty because it did not believe that he acted in self-defense.

temperament. But a jury that had already discredited the appellant's claim that he reasonably believed deadly force to be immediately necessary would be unlikely to believe that, at the time the appellant first fired, he was actually experiencing a level of fear that caused him to lose control. Moreover, even had the jury believed that the appellant *subjectively* experienced such a level of fear, it would not likely have found that Johnson's behavior presented a provocation adequate to produce such a degree of fear in a man of ordinary temperament. Based on the record and evidence before us, it is exceedingly unlikely that the appellant suffered "some harm" as a result of the trial court's failure to give the jury a sudden passion instruction based on the appellant's assertion that terror or fear controlled his actions.[45]

## CONCLUSION

The court of appeals erred to find "some harm" under *Almanza* simply because the appellant was subjected to a greater range of punishment than he would have faced had the jury been instructed on, and found in the appellant's favor with respect to, the issue of sudden passion. We hold that the court of appeals erred in reversing the trial court's judgment with respect to punishment. Accordingly, we reverse the judgment of the court of appeals and

---

[45] In *Trevino*, even after rejecting the evidence supporting self-defense, the jury could have relied on separate evidence that it had not yet necessarily discredited to support Trevino's claim of sudden passion. The jury could have believed that Trevino initially acted in sudden passion and only later staged the crime scene to make it look like self-defense. That is not the scenario in the instant case. Here, the same evidence raised both issues, and the jury's rejection of the evidence adduced to show immediate necessity necessarily indicates that it would not have looked favorably upon the appellant's claim *either* that he subjectively experienced the requisite degree of fear *or* that an adequate cause for such a degree of fear existed.

affirm the judgment of the trial court.


DELIVERED:       June 12, 2013
PUBLISH