

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00022-CR

_____

CARLOS IVAN DELANGELHERNANDEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1558072R

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

### I. Introduction

A jury found Appellant Carlos Ivan Delangelhernandez guilty of continuous sexual abuse of young children—the first count of a five-count indictment alleging various acts of child sex abuse[1]—and the trial court sentenced him to 50 years' confinement.[2]  *See* Tex. Penal Code Ann. § 21.02.

In his first point, Delangelhernandez complains that count one of the jury charge was defective in that it misplaced the "intentionally or knowingly" mental state in the application paragraph,[3] permitting the jury to convict him on a finding of "intentionally or knowingly" instead of the specific intent requirement of indecency with a child.  In his second point, he argues that the jury charge's mental state definitions were erroneous because they were not tailored to the conduct element of

---

[1]The remaining four counts were all lesser offenses:  two counts of aggravated sexual assault of C.A. (one of which was waived before trial), one count of indecency with a child with C.A., and one count of indecency with a child with A.P.  *See id.* §§ 21.11, 22.021.

[2]The minimum sentence for continuous sexual abuse of young children is 25 years' confinement.  *See* Tex. Penal Code Ann. § 21.02(h) (stating that the offense is a first-degree felony with a punishment range of 25–99 years' confinement or life confinement).

[3]The application paragraph is the jury charge's "heart and soul" because it specifies the factual circumstances under which the jury should convict or acquit. *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012).  That is, it explains to the jury in concrete terms how to apply the law to the case's facts. *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013).

aggravated sexual assault of a child, the first predicate offense alleged in count one. Because the record does not reflect that the trial court's errors, if any, caused Delangelhernandez egregious harm, we affirm.

## II. Discussion

Although Delangelhernandez did not object to the jury charge during trial, we must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Preservation, or the lack thereof, merely determines whether we review the error for actual harm or egregious harm. *See Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also* Tex. Code Crim. Proc. Ann. art. 36.19.

Egregious harm—the standard applied to unpreserved charge error—is a "high and difficult standard" to meet, and such a determination must be "borne out by the trial record." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). The appropriate inquiry for egregious harm is fact- and case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011). In making an egregious harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–

3

10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172).

Assuming, without deciding, that the trial court erred,[4] based on our analysis below, we conclude that egregious harm that would justify reversal did not occur.

## A. The State of the Evidence

A.P., A.P.'s mother, C.A., C.A.'s mother, two sexual assault nurse examiners, the investigating detective, a forensic interviewer, Delangelhernandez, and Delangelhernandez's older brother Jose testified during the guilt-innocence phase of trial.

A.P.'s mother moved A.P. and his brother to Texas in September 2008 so they could live with Jose, her boyfriend, who had a son who was a little older than A.P. When they moved in, Delangelhernandez was also residing in the same house. A.P., who was fifteen years old at the time of the trial in January 2019, described Delangelhernandez as having been "like a cool uncle" who took the boys to

---

[4]An error analysis is not required when a harm analysis is dispositive. *Wooten v. State*, 400 S.W.3d 601, 607 (Tex. Crim. App. 2013) ("Finding our harm analysis thus dispositive, we need not address whether the trial court did, in fact, err not to include the instruction."); *Roberts v. State*, No. 02-17-00108-CR, 2018 WL 1755223, at *3 n.5 (Tex. App.—Fort Worth Apr. 12, 2018, no pet.) (per curiam) (mem. op., not designated for publication).

4

restaurants and the park, played video games with them, and brought them a puppy and other gifts.

A.P. recounted that one February evening, when A.P. was around six years old, his mother and Jose went out and Delangelhernandez babysat. After distracting the other children with video games,[5] Delangelhernandez took A.P. into a darkened bedroom where he pulled down A.P.'s pants and underwear and touched and rubbed between A.P.'s butt cheeks with his penis. A.P. said that the room had twin beds and that Delangelhernandez placed him on his side on the right bed, facing the wall, before he pulled A.P.'s pants and underwear down to his knees. Delangelhernandez was on his side right behind him. The bedroom door was open and A.P. could hear the other children playing video games while it happened.

A.P. said that Delangelhernandez's penis had felt warm and wet. He was confused but did not try to fight back because he "wasn't a hundred percent sure, like, that was – how to feel about that because [he] didn't know what good and bad was yet," and because Delangelhernandez was someone he was supposed to look up to and respect. According to A.P., the encounter spanned more than five minutes but less than ten minutes. A.P. did not know if Delangelhernandez had ejaculated. After Delangelhernandez left the room, A.P. put his clothes back on and thought about

---

[5]A.P. said that Delangelhernandez had also brought the puppy that night, but his mother testified that Delangelhernandez had brought the puppy on a different occasion.

what had happened before rejoining the other children.[6]  Delangelhernandez moved out in 2010 and into C.A.'s aunt's house.

C.A., who was nineteen at the time of the trial, testified that Delangelhernandez had been his parents' friend.  At some point before 2013, while Delangelhernandez was living in C.A.'s aunt's house, C.A. stayed over.[7]  C.A. recalled that it was a summer evening and that he had gone to bed on the floor between his cousin's bed and Delangelhernandez's bed.[8]  He woke up that night to Delangelhernandez's touching him.

C.A. described the encounter as follows,

I remember -- I remember just waking up and just feeling this pain. I can't really describe the type of pain that I felt, but it really hurt. And I felt it in my back, lower back and in my groin area. It really hurt a lot. At that time I had no idea what it was. At first I felt like I was having a wet dream or something, but I came to conclusion, no, I'm wide awake and something is happening. . . .

It felt -- it felt erect and it felt like hard, like it was ready to do something to me. And at that moment he just put it inside my anus and just started going back and forth, back and forth, and just -- was just leaning against me and just whispering -- I don't understand what he was saying, but he was just mumbling and he was just whispering, whispering.

---

[6]A.P. did not recall exactly how old he was when the incident occurred but said he had probably been between six and eight years old.

[7]C.A. could not remember exactly how old he was but stated that he had been young, between ages eight and eleven.

[8]Delangelhernandez said that when C.A. had slept over, they had always given him a bed.

The encounter lasted between five and ten minutes. C.A. said that Delangelhernandez had ejaculated because when he went to the bathroom and wiped his butt, he saw semen. The next morning, C.A. tried to act like nothing happened and went home.

C.A. said that the second incident happened when he was between twelve and fourteen years old. His parents had invited Delangelhernandez to a get-together at their house. C.A. went to bed, and as he was going to sleep, he felt someone touch his penis over his clothes. When he woke up, he saw Delangelhernandez standing there. Delangelhernandez told him that he had just come in to turn off the TV, and he turned off the TV and walked out.

C.A. did not tell anyone until 2017, when he revealed it to his girlfriend during an emotional argument late one night. At his girlfriend's urging, C.A. immediately woke his parents up and told them about the first incident.[9] C.A.'s mother testified that this occurred on June 12, 2017, and that when C.A. woke them, he was "crying like a baby," and after she asked him what was wrong, he related what Delangelhernandez had done. C.A.'s parents called the police a few hours later, and sometime after making their report, it occurred to C.A.'s mother that if this had

---

[9]C.A.'s older brother had died, which had been very hard on his family, and he had not wanted to make things worse. Delangelhernandez testified that C.A. and his older brother used to come over to their aunt's house together but after C.A.'s brother died, C.A. visited only once or twice.

7

happened to C.A., it could have happened to other children. She contacted A.P.'s

mother through Facebook, which led to A.P.'s outcry to his mother.[10]

A.P.'s mother testified about A.P.'s outcry as follows,

> He said he -- I was sitting on the -- I was playing with -- with the -- my brothers, Wii in the living room. He came to the living room, he came from the room from the hallway and he told me to come with him. He grabbed me by my hand, we went into my room. I was standing. And then he pull his pants and he start rubbing his private part into my butt cheeks.

She asked A.P. what he wanted to do, and he told her, "Mom, I want him in jail."

Trista Burden, the forensic interviewer, testified about how children disclose

sexual abuse,[11] explained the concept of "grooming," both done individually, to

establish rapport with the child and maximize access to the child, and done with the

child's environment, to prevent disclosure,[12] and she explained about how sensory and

---

[10]A.P. testified that he had not previously told anyone because when he realized that what had happened was bad, and how bad it was, he did not know how to tell anyone, and he did not want to jeopardize his mother's relationship with Jose.

[11]Burden explained to the jury that disclosure involved a series of stages that a child could move back and forth through: denial, tentative, active, recantation, and reaffirmation. She described the tentative phase as the child "talking about it a little bit because [he] want[s] to see how people are going to react," and the active phase as "I'm ready to talk about it." Burden said that some people stay in the denial phase forever, while sometimes an accidental disclosure may occur, meaning, "I am not choosing to talk about this, but something happened and it came out," such as through a note in a diary or a text seen by a parent or through confiding in a best friend.

[12]Burden said that individual grooming could be special treatment, gift-giving, secrets, "[a]nything kind of special that make[s] that child feel different."

8

peripheral details can help establish whether a child is being truthful.[13] She conducted both forensic interviews.

Arlington Police Detective Mary Tenorio testified that after A.P. and C.A.'s forensic interviews, on June 19, 2017, and July 3, 2017, respectively, she made referrals for them to have sexual assault exams.

Valerie Penic, the sexual assault nurse examiner (SANE) who conducted A.P.'s sexual assault exam at Cook Children's hospital on June 23, 2017, testified that while she had performed over 200 sexual assault exams on children, only a dozen of those had been on boys because "[t]hey don't typically report." She attributed the lack of reporting to the way boys are raised "to be strong, masculine," and not to outwardly show pain or sadness. A.P. told her:

> It was nighttime. My mom and dad weren't there. They went out to eat like a date night.
>
> The guy that did it is my stepdad's brother. He came to babysit my brother and I. And there was another family member, but he was a kid too.

---

Environmental grooming, on the other hand, "is where a perpetrator is very purposely, with that trust dynamic, building that trust within the family, allowing for the perpetrator to be maybe a caregiver that's alone with the child."

[13]Burden explained that sensory details pertained to the five senses: what the child saw during the abuse, heard while the abuse was taking place, and smelled and tasted during the incident. She described peripheral details as the surroundings— what the child was wearing, where the abuse occurred, whether the lights were on and off, and so on.

9

We were playing video games. He suddenly grabbed me by the arm and took me to the room. The door was open. He set me on the bed. The light was off. I was laying sideways. He pulled down my pants, and then he pulled down -- pulled his down too. Then he rubbed his penis on my butt cheeks. Then he got up and went back to the living room. I stood there a while because I didn't know what to do. That's all I remember.

Cindy Romaguera, a SANE at John Peter Smith hospital, testified that of the over 250 sexual assault exams that she had performed at JPS, only 30 had been on male patients, and that Cook Children's hospital conducted the exams on adolescents. On July 7, 2017, she performed C.A.'s sexual assault exam at JPS, and he told her,

It was a summer day. I was at my cousin's house. I decided to stay the night. I started to feel something weird. I thought I was having a wet dream. I woke up and felt pain in my rectum area, his penis was inside of me. I was on the floor between the beds. I heard him breathing. It went on for ten minutes until his ejaculation. I was afraid. He put my clothes back in place. I turned over and saw him. He was facing the other way getting into the other bed. I went to the restroom and wiped and saw semen on the paper, and it smelled like it. I went to sleep in the living room.

Romaguera said that it was very difficult for C.A. to talk with her about what had happened and that he told her that Delangelhernandez, who he said was 29 years old at the time of the incident, had done this seven years before.

Jose, Delangelhernandez's older brother, testified that he did not know when Delangelhernandez could have abused A.P., but he acknowledged that he did not know what happened when he and A.P.'s mother were not at home. He said that A.P. had never behaved unusually around Delangelhernandez or indicated that anything bad had happened.

10

Delangelhernandez testified that he was married and had two stepsons and one biological son with his wife. He confirmed that he had bought a Wii for his brother's child and stepchildren for Christmas and had babysat them but denied having sexually abused A.P. or C.A. When asked on cross-examination, "So, your testimony today is that they told the truth about everything other than the sexual abuse that happened to them," he replied, "Yes."

## B. The Indictment and the Jury Charge

The indictment alleged that Delangelhernandez,

on or about the 4th day of August 2008 through on or about the 3rd day of August 2013, during a period of time that is 30 days or more in duration, did intentionally or knowingly commit two or more acts of sexual abuse, to wit: aggravated sexual assault of a child under 14, against [C.A.] by causing the sexual organ of the defendant to contact the anus of [C.A.], and/or indecency with a child against [A.P.] by engaging in sexual contact with [A.P.] by touching any part of the body of [A.P.] with any part of the genitals of the defendant with the intent to arouse or gratify the sexual desire of any person, and at the time of the commission of each of these acts of sexual abuse the defendant was 17 years of age or older and [C.A.] was younger than 14 years of age, and [A.P.] was younger than 14 years of age, and neither were the spouse of the defendant.

In contrast to the indictment, the abstract portion of the jury charge did not contain the complained-of "intentionally or knowingly," stating,

A person commits the offense of "continuous sexual abuse of a young child or children" if, during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, and at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

11

The abstract portion of the charge defined "act of sexual abuse" to include both aggravated sexual assault and indecency with a child, if the indecency offense was "committed in a manner other than by touching, including touching through clothing, the breast of a child."

The abstract portion of the charge defined the offense of "aggravated sexual assault" to include, among other things, "intentionally or knowingly caus[ing] the penetration of the anus . . . of a child by any means" when the child is younger than 14 years of age. And it defined the offense of indecency with a child as "engag[ing] in sexual contact with the child or caus[ing] the child to engage in sexual contact; or with intent to arouse or gratify the sexual desire of any person, expos[ing] the person's anus or any part of the person's genitals, knowing the child is present; or caus[ing] the child to expose the child's anus or any part of the child's genitals" when the child is younger than 17 years of age. It defined "sexual contact" as "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child with intent to arouse or gratify the sexual desire of any person."

The abstract portion of the jury charge also defined the intentional[14] and knowing[15] mental states before instructing the jury that it did not have to agree

---

[14]The abstract portion of the charge stated, "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or to cause the result."

12

unanimously with respect to the offense of continuous sexual abuse as to which specific acts of sexual abuse were committed but rather had to be unanimous that two or more acts of sexual abuse "as that term has been previously defined and as alleged in the indictment" were committed.

The application portion of the charge mirrored the indictment, stating,

> Now, if you find from the evidence beyond a reasonable doubt that the defendant . . . on or about the 4th day of August 2008 through on or about the 3rd day of August 2013 . . . did during a period of time that is 30 days or more in duration, did intentionally or knowingly commit two or more acts of sexual abuse, to wit: aggravated sexual assault of a child under 14, against [C.A.] by causing the sexual organ of the defendant to contact the anus of [C.A.], and/or indecency with a child against [A.P.] by engaging in sexual contact with [A.P.] by touching any part of the body of [A.P.] with any part of the genitals of the defendant with the intent to arouse or gratify the sexual desire of any person, and at the time of the commission of each of these acts of sexual abuse the defendant was 17 years of age or older and [C.A.] was younger than 14 years of age, and [A.P.] was younger than 14 years of age, and neither were the spouse of the defendant, then you will find the defendant guilty of the offense of continuous sexual abuse of a young child as charged in Count One of the indictment, and you will not consider Counts Three through Five of the indictment.

And the verdict form, upon which the jury found Delangelhernandez guilty of the continuous sexual abuse offense, stated, "We, the jury, find the defendant . . . guilty of

---

[15]The abstract portion of the charge stated, "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."

13

the offense of continuous sexual abuse of a young child as charged in Count One of the indictment."

The jury charge also instructed the jury that unless it found each element of an offense beyond a reasonable doubt, it was required to acquit Delangelhernandez and reminded the jury about Delangelhernandez's presumption of innocence.

## C. Arguments and Statements of Counsel to the Jury

During voir dire, the prosecutor defined intentionally and knowingly for the jury and then explained that "the continuous charge" was "kind of an umbrella" that held underneath it individual charges of aggravated sexual assault and indecency that the State had to prove took place outside of 30 days. The prosecutor also explained that there was not a limit on the number of victims "depending on the number of instances" of sexual misconduct alleged. The prosecutor then again reiterated that "continuous is kind of an umbrella" covering specific instances. The prosecutor informed the jury,

> Okay. So here's the difference in the elements of the two charges that we've talked about underneath continuous sexual abuse of a child.
>
> At first we have aggravated sexual assault of a child. And what that is, is this defendant, in Tarrant County, Texas, on or about a certain date, all that stuff, intentionally or knowingly penetrated or contacted the sexual organ or anus of a child under 14 with any part of the defendant's body. Does that make sense to everybody?

After explaining the distinction between penetration and contact, the prosecutor continued,

14

Okay. And then indecency, it's the same thing, defendant, on or about a certain date, in Tarrant County, Texas, contact a child – contact with a child and with their genitals or they contact the child's genitals with intent to arouse or gratify the sexual desire of anyone, okay.

The prosecutor discussed the "intent to arouse or gratify," stating,

Intent to arouse or gratify, this is our last element in the indecency charges. Basically, it just has to -- we have to prove that either the defendant did it to arouse himself or gratify himself, or to arouse his victim and gratify his victim. And you might ask, well, how can we do that? Well, you know, there's plenty of ways to prove intent. Intent can be inferred from any type of action that we might prove to you through testimony, through any other type of evidence. It could be from conduct, it could be from remarks made when the alleged conduct was going down, or it could be all of the surrounding circumstances, okay.

The prosecutor told the jury during his opening statement that the evidence would show that Delangelhernandez had groomed the victims before he sexually abused them at least 30 days apart. During closing arguments, the prosecutor argued that the offenses were 30 days apart, even if they happened in the same year, because C.A. said it happened to him in the summer and A.P. said that it happened to him in February, and that there were plenty of sensory details to support the boys' testimony.

Delangelhernandez argued that it was the boys' word against his and that his brother said that he never saw any changes in A.P.'s behavior. In rebuttal, the prosecutor argued that the boys were more credible, particularly when Delangelhernandez never said why the boys might make up their story.

15

**D. Other Relevant Information**

Courts have considered items such as a jury's rejection of a charged count and whether the jury sent clarification requests during their deliberations. *See Flores v. State*, 513 S.W.3d 146, 161 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). The clerk's record does not reflect that the jury sent out any clarification requests. However, the record does reflect that the jury deliberated only 29 minutes, from 3:09 p.m. to 3:38 p.m., before issuing the guilty verdict.

**E. Analysis**

Looking at the charge as a whole, the abstract portion of the charge accurately stated the substantive law, thus informing the jury of what the State had and did not have to prove, and the record reflects that from voir dire onward, the jury was informed that continuous sexual abuse of a child was an "umbrella" under which it had to find two predicate offenses—aggravated sexual assault of a child and indecency with a child—separated by at least 30 days. And except for the occurrence of the alleged offenses, Delangelhernandez did not dispute any of the facts. Accordingly, the contested issue at trial was witness credibility; C.A. and A.P.'s testimony contained all of the elements of continuous sexual abuse of young children and the predicate offenses, and—based on the verdict and the extremely brief deliberation period—the jury found their testimony more credible than Delangelhernandez's. *See Bazanes v. State*, 310 S.W.3d 32, 37 (Tex. App.—Fort Worth Feb. 18, 2010, pet. ref'd) (holding charge error not egregiously harmful when, among other things, primary contested

16

issue at trial was witness credibility). That is, the jury, as the sole judge of the witnesses' credibility and the weight to be given their testimony, could have inferred that Delangelhernandez had the intent to arouse or gratify his sexual desire when he positioned his penis between A.P.'s butt cheeks and that he intentionally or knowingly caused his penis to contact C.A.'s anus. *See id.* Based on our review of the charge, the evidence, the arguments of counsel, and other relevant information, we conclude that Delangelhernandez was not egregiously harmed and overrule his two points.

### III.  Conclusion

Having overruled Delangelhernandez's two points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  January 9, 2020

17