# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00445-CR

---

**Ray Canek Vera, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 51ST DISTRICT COURT OF TOM GREEN COUNTY**
**NO. A-22-1126-SB, THE HONORABLE CARMEN DUSEK, JUDGE PRESIDING**

---

### O P I N I O N

Ray Canek Vera appeals his murder and two aggravated assault convictions. He argues the trial court erred in (1) excluding, at the guilt-innocence stage, the testimony of the defense's forensic psychologist expert's testimony, and (2) refusing, at the punishment stage, to instruct the jury on sudden passion. Holding the trial court did not err in either the exclusion or the refusal, we will affirm.

### BACKGROUND

This case arose from inadvertent contact on the dance floor at Whiskey River Saloon in San Angelo. Three Marine staff sergeants, Bryce Rudisell, Col Hunsberger, and Devin Casey, and an Army staff sergeant, Andrew Cauwel, were at Whiskey River with Rudisell's girlfriend, Diana Umbarger, and Hunsberger's neighbor, Brandon Poyner, on October 2, 2022, celebrating Hunsberger's promotion and Cauwel's birthday. Vera, his wife Cindy Magdelena, and

his friends—Raymond Scott and his spouse Sonia, Julian Suarez, Anthony Giese and his wife Jennifer Guerrero, David McGary, and Christopher Hall—were also at Whiskey River. On the dance floor, during a cumbia, Casey bumped into Vera and his wife. Hunsberger and Casey tried to apologize but the apology was not accepted; Vera responded with "fucking faggot" and "fuck you, faggot." The military group left the dance floor; Vera and his wife kept dancing, and each time they circled the floor Vera continued to swear and gesture at them; they responded in kind. At some point Vera's wife went up to the military group and Casey again apologized, but some of Vera's group followed when they thought they saw her pushed. A member of Vera's group punched Casey and knocked him down, and a fist fight ensued.

Cauwel had one of Vera's group on the ground and repeatedly punched him. Vera got knocked down and his glasses came off and broke. Whiskey River staff turned on the lights, broke up the fight, and told everyone to leave. The military group left the bar and headed toward their cars. Vera's group followed.

As Hunsberger walked towards Poyner's truck, Suarez approached him from behind and broke a glass beer mug over his head. When Hunsberger turned around to face Suarez, Suarez swung at him with the broken mug handle. What followed was a melee.

Casey ran into the fight to defend Hunsberger, put his shoulder down and ran into Suarez; Vera approached Casey, brandished a knife, and swung at him. Casey realized he was bleeding from his chest, "looked up after" and saw Vera with the knife, saying, "Come on, motherfucker." Casey called out, "I got stabbed," walked away from the group to call 911, passing Rudisell's car. Rudisell and his girlfriend were already in it, Cauwel was about to get in it, but when they saw Casey injured, Rudisell and Cauwel jumped in to join the fight. Rudisell shoulder

2

checked one of Vera's crew and they both went to the ground. Rudisell got up and then came face to face with Vera, who stabbed him in the heart.

Cauwel, who had walked up behind Giese and tried to pull him away, "got sideswiped and then it just kind of was all black and white from there, after getting jumped by I don't know how many people." Somebody from Vera's group put Cauwel in a headlock while Suarez stabbed him with the glass handle from the smashed beer mug and Vera and a woman kicked him. They stopped when they heard sirens.

Casey found Rudisell leaning against a vehicle. Rudisell said he had been stabbed, then collapsed in front of him. Cauwel tried to hold pressure on Rudisell's chest, but people were pulling him away because he himself was severely injured. Members of Vera's group fled in a black Suburban; a bystander captured the license plate number.

When emergency personnel arrived, Rudisell was still conscious, breathing and talking. But he started to drift or fade out, stopped talking and fell unconscious, and his breathing started to slow. All four were transported to the hospital; Rudisell never regained consciousness and later died from his wound.

The license plate number led detectives to Scott, who identified the man wielding the knife (the two fights had been captured on the bar's surveillance video) as Vera.

A grand jury indicted Vera on multiple counts, alleging he did:

- intentionally and knowingly cause the death of Rudisell by stabbing him with a knife;

- intentionally, knowingly, and recklessly cause bodily injury to Casey by stabbing him with a knife and used or exhibited the knife as a deadly weapon; and

- intentionally, knowingly, and recklessly cause bodily injury to Cauwel by cutting him with a piece of glass and used or exhibited the glass as a deadly weapon.

3

The State's evidence included considerable video footage (from among the surveillance cameras and several uninvolved witnesses' cell phone cameras); the testimony of Hunsberger, Casey, Cauwell, Poyer, Umbarger, several eyewitnesses, responding officers, and the bar manager; Vera's custodial statement, in which he said he did not recall what had happened, did not think he had a knife, and did not have anything to do with the stabbings; and the switchblade knife with Rudisell's blood on it[1] that was found on the dash of Vera's vehicle. On cross-examination, the Defense brought out the fact that the military group (save its designated driver) had been drinking for four or five hours at Fiddlestrings before continuing their night at Whiskey River.

After the trial court excluded Vera's forensic psychologist Leana Talbott's testimony—which would have been about the "fight or flight" response and alcohol's impact on the brain and why the combination can lead to aggressive behavior—the Defense rested without putting on any evidence. The trial court denied a request for an instruction on manslaughter.

The jury convicted Vera as the principal actor in the stabbing-with-a-knife counts and as a party to Suarez in the cutting-with-glass count. At punishment, the State put on evidence that Vera had been wearing a "Support Your Local Bandidos" shirt on the night of the stabbings; Vera was a former sergeant-at-arms in the Jinetes, a motorcycle support club for the Bandidos, not itself classified as an outlaw motorcycle gang or criminal street gang; and other members of Vera's group were documented members of either the Bandidos (Suarez, McGary and Hall) or the Jinetes (Giese). Up until this incident, Suarez had been the president of the San Angelo Bandidos.

---

[1] Jason White, a forensic scientist with the Texas Department of Public Safety Crime Laboratory testified that the "probability of obtaining this profile [from Stain 2 on the switchblade knife], if the DNA came from Rudisell, is seventeen point zero sextillion times greater than the probability of obtaining this profile if the DNA came from an unrelated, unknown individual."

4

Vera testified at punishment that he joined the fight to protect his wife and defend his friends, conceded he had over-reacted, and apologized. He also testified that while he was previously a member of the Jinetes, he paid $900 to get out of the club a few months before this incident. Vera requested an instruction on sudden passion. The trial court refused to give it, finding that "yelling and pushing is not adequate cause to rise to that level of rage or anger so that you would not be capable of . . . cool reflection." And the jury assessed punishment at life imprisonment on the murder count and 20 years' imprisonment on the aggravated assault counts. This appeal followed.

## ANALYSIS

### *Exclusion of Defense's Forensic Psychologist Expert Testimony*

Vera first asserts that the trial court erred by excluding expert testimony regarding the fight-or-flight response and intoxication because such testimony would have rebutted the knowing/intentional element of the murder offense and would not have confused the jury given the Texas Penal Code section 8.04 instruction that intoxication is not a defense to the commission of a crime.

*Applicable Law and Standard of Review*

A reviewing court evaluates the trial court's decision to admit or exclude expert testimony under an abuse of discretion standard. *Kelly v. State*, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992). A trial court does not abuse its discretion by excluding expert mens rea testimony if: (1) the expert is insufficiently qualified, or the testimony is insufficiently relevant or reliable under the rules governing expert testimony (Rules 702–705); or (2) the evidence's probative value is substantially outweighed by the danger of unfair prejudice under Texas Rule of Evidence 403; or

5

(3) the evidence does not truly negate the required mens rea. *Ruffin v. State,* 270 S.W.3d 586, 595 (Tex. Crim. App. 2008). Conversely, a trial court does abuse its discretion by categorically barring such evidence without resort to a specific evidentiary rule. *Id*. at 596.

*Application*

In her proffer, Dr. Leana Talbott, a forensic psychologist, set out her proposed testimony on the stress response. She described the fight-or-flight response, where the involuntary part of the nervous system (the limbic system) becomes highly activated and the executive function part of the brain (the prefrontal cortex) becomes deactivated. She testified that "depending upon kind of individual factors, twenty to sixty minutes is pretty common for the amount of time that it takes to kind of come out of that hormone cascade that happens out of that acute adrenaline cascade that's going through the body."

And she described the effects of alcohol on the process as compounding or having a synergistic effect: "alcohol has an effect on the amygdala" or the emotional center of the brain; it impacts "the amygdala's ability to kind of talk to the prefrontal cortex" or thinking part of the brain; this makes people less able to accurately assess visual stimuli or sensory input causing "misfires and miscommunications between the amygdala and that prefrontal cortex that have an impact just on somebody's thinking processes and cognition." So, "if we add alcohol to the mix we are looking at memory consolidation challenges with alcohol and a fight or flight response. We are looking at misfires and reduced inhibition, right, with alcohol, and then this fight or flight response; and so sometimes, you know, people behave in ways they wouldn't normally behave when they're intoxicated."

Dr. Talbott had met with Vera three times, reviewed video footage and discovery documents, and had a theory about the big picture of the event: "alcohol was involved and also that there was fight or flight going on, that there were response tendencies that suggest fight or flight involved where participants were approaching the stressor event with a survival instinct, and fight or flight was very evident in the bigger picture of the event."

After the proffer, the trial court acknowledged that the expert was qualified but questioned how the testimony would "assist the jury." Vera argued it was to put before the jurors evidence from which they could deduce that Vera had acted recklessly and to entitle him to a lesser-included instruction on manslaughter. The State argued that the testimony would be "backdooring intoxication as a defense to the commission of this crime when it is not," and the testimony would be confusing to the jury regarding the issue of intoxication and whether it should be considered as a defense to the offense "or even a defense to the mens rea in this case."

The trial court sustained this objection—referencing its review of case law and commentary on rules pertaining to experts.

We cannot conclude that the trial court abused its discretion in excluding the expert testimony. Texas has already decided that expert testimony on intoxication, at least, is insufficiently relevant or adequately probative to truly negate the required mens rea. The Texas Court of Criminal Appeals addressed the admissibility of expert testimony on the cognitive effects of intoxicating substances at the guilt stage of a trial in *Davis v. State*, 313 S.W.3d 317, 327–29 (Tex. Crim. App. 2010). In that case, the defense sought to introduce expert psychiatric testimony about the effects of crack cocaine use on the ability to form intent or control impulse. *Id*. at 328. The court explained that while "evidence of a mental disease or defect may be relevant and admissible to rebut or disprove the defendant's culpable mens rea," the voluntary intoxication

7

question is governed by "Texas Penal Code § 8.04." *Id.* The court noted that it had previously (1) construed the statute as prohibiting any attempt to use intoxication to rebut or disprove a defendant's mens rea; and (2) explained that "Texas Penal Code § 8.04(a) bars the use of evidence of voluntary intoxication to negate the culpable mental state of a crime." *Id.* at 328–29. It held that "because [the expert] testimony was proffered at the guilt stage of trial to show [the defendant's] intoxication from cocaine use prevented him from forming the applicable *mens rea*, the evidence was inadmissible." *Id.* at 329.

The testimony proffered here was more nuanced than that in *Davis* because it touched on the compounding effect of alcohol on the fight-or-flight response. *See Kitchens v. State*, 721 S.W.3d 467, 474–75 (Tex. Crim. App. 2025) (referencing defense expert's testimony about fight-or-flight response). But at no point did Vera offer to separate out the clearly inadmissible testimony about intoxication from the possibly admissible testimony about the fight-or-flight response. And under Texas law, neither the trial court nor an appellate court is required to independently address admissible and inadmissible portions of testimony where, as here, the offering party failed to segregate and separately offer those portions at trial. *See Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002); *Schmidt v. State*, 612 S.W.3d 359, 368 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). Therefore, the trial court did not abuse its discretion in excluding the testimony given *Davis*.

We overrule Vera's first ground for review.

8

***Failure to Instruct the Jury on Sudden Passion***

Vera next argues that the evidence raised the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause, and he was therefore entitled to a jury instruction on it.

*Applicable Law and Standard of Review*

"At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." Tex. Penal Code § 19.02(d). "If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id*.

To justify a jury instruction on the issue of sudden passion at the punishment phase, the record must at least minimally support an inference that: (1) the defendant acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) his sudden passion was induced by a provocation by the deceased or another acting with him—the kind of provocation that would produce such a passion in a person of ordinary temper; (3) he committed the murder before regaining his capacity for cool reflection; and (4) a causal connection existed between the provocation, passion, and homicide. *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013) (incorporating definitions of "sudden passion" and "adequate cause" set out in Tex. Penal Code § 19.02).

Such a charge "should be given if there is some evidence to support it, even if that evidence is weak, impeached, contradicted, or unbelievable." *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). "If the evidence thus raises the issue from any source, during either phase of trial, then the defendant has satisfied his burden of production, and the trial court must

9

submit the issue in the jury charge—at least if the defendant requests it." *Wooten*, 400 S.W.3d at 605. When an appellant protests that the trial court erred by not granting his request to charge the jury on sudden passion, a reviewing court must first determine whether the complained-of error exists. *Id*. at 606. Its "duty is to look at the evidence supporting that charge, not on the evidence refuting it." *Trevino*, 100 S.W.3d at 239. If the reviewing court agrees the requested instruction should have been given, it then analyzes whether the error caused "some harm." *Wooten*, 400 S.W.3d at 606.

*Application*

While there is some evidence of the *Wooten* factors listed above, we do not see any evidence supporting "adequate cause" as it is defined—"cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code § 19.02(a)(1). As stated at the outset, the indoor fight started after an incident on the dance floor. The video evidence supports Vera's testimony that, at least indoors, he reacted after he felt his wife had been threatened by the military group. While sudden passion might arise in a person who sees their spouse surrounded by several men acting in an aggressive posture, that sudden passion would subside once the bar fight was broken up, the lights were turned on in the bar, and everyone was told to leave.

There is no evidence that this was a fight between groups with a longstanding rivalry—or any rivalry at all. Though the indoor fight was provocative enough for Vera and his friends to start a new fight outdoors, the indoor fight was over almost as soon as it started. In a 911 call the bartender made during the indoor fight, she initially asked for an officer to come to Whiskey River because "we have some biker guys starting a fight inside the bar." Asked by the

10

dispatcher if any had weapons, the bartender said "no." Asked how many people there were, she said "like six guys, the security guy is pushing them out right now"; "the other guys that they were fighting are already leaving." Thirty-six seconds into the call she said, "I think it should be fine, I'm sorry . . . never mind, the security guy's got it under control." And the surveillance video from the bar supports that narration; it shows the lights come on in the bar. People were told to leave the bar and they did.

But Vera and his friends, after circling up inside, ran outside to catch up with the military group to start a new fight—and at least Suarez and Vera carried weapons. Bar patron Marissa Monreal testified that the military group was walking away when they were attacked. And "we kind of just stood there because a group of people came running past us with bottles and stuff chasing the military people to their cars." Victor Rodarte, another bar patron, testified he saw the military guys leave and the other group "[c]hase after them outside." He "noticed the military guys kind of like backing up, running kind of backwards; but they're, you know, facing toward the door kind of like watching their backs, and that's when I noticed the other group following them and just trying to get to fight them again and that's when everyone started fighting again and then that's when two of the military guys started getting actively jumped from that—from those individuals."

Subjective passion alone does not justify submission of a sudden passion instruction; the instruction is not available to one "whose actual emotional responses are aberrational in this society." *See Corral v. State*, 900 S.W.2d 914, 919 (Tex. App.—El Paso 1995, no pet.). Vera admitted he "overreacted" and that his group could have left instead of starting the fight outside. Vera's admission states the obvious captured on video: he brought a knife to a fist fight that had already dissipated. Of course, our "duty is to look at the evidence supporting that

11

charge, not on the evidence refuting it." *Trevino*, 100 S.W.3d at 239. But, in this case, Vera fails to indicate what this evidence is, relying instead on the objective proposition that "things said and done to women can provoke men to sudden passion and violence while attempting to protect them," and we are unable to find such evidence—"even weak, impeached, contradicted, or unbelievable"—in the record. *Id*. at 238. Because the record does not "at least minimally support an inference" that Vera's actual sudden passion was induced by a provocation—the kind that would produce such a passion in a person of ordinary temper—by the deceased or another acting with him, the trial court did not err in refusing to give the sudden passion instruction. *Wooten*, 400 S.W.3d at 605. We overrule Vera's second ground for review.

## CONCLUSION

Having overruled Vera's two grounds for review, we affirm the judgments of the trial court.

_____

Chari L. Kelly, Justice

Before Justices Triana, Kelly, and Ellis

Affirmed

Filed:   April 30, 2026

Publish

12