**Opinion issued November 16, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00421-CR

———————————

**STEVEN CURRY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 263rd District Court
Harris County, Texas
Trial Court Case No. 1528845

## MEMORANDUM OPINION ON REMAND

A jury found appellant, Steven Curry, guilty of the felony offense of failure

to stop and render aid[1] and assessed his punishment at confinement for six years.  On

---

[1]     *See* TEX. TRANSP. CODE ANN. § 550.021.

original submission, in two issues, appellant contended that the evidence was insufficient to support his conviction and the trial court erred in denying his request for a jury instruction on mistake of fact.

This Court previously held that the evidence was sufficient to support appellant's conviction for the felony offense of failure to stop and render aid and the trial court did not err in denying appellant's request for a jury instruction on mistake of fact.[2] *See Curry v. State*, 569 S.W.3d 163, 167–69 (Tex. App.—Houston [1st Dist.] 2018) (*Curry I*), *rev'd in part*, 622 S.W.3d 302 (Tex. Crim. App. 2019) (*Curry II*). Having so held, the Court affirmed the trial court's judgment. *Curry I*, 569 S.W.3d at 169.

Appellant then filed a petition for discretionary review with the Texas Court of Criminal Appeals, which the court granted. The court affirmed this Court's holding that the evidence was sufficient to support appellant's conviction. *See Curry II*, 622 S.W.3d at 310–11. But, as to appellant's complaint that he was entitled to a jury instruction on mistake of fact, the court reversed our holding, concluding that "the mistake-of-fact issue . . . should have been submitted for [the jury's] consideration because it was raised by the evidence." *Id.* at 311–12. The court, thus,

---

[2] The defense of mistake of fact is codified in Texas Penal Code section 8.02(a), which provides that it is a defense to prosecution if the actor, through a mistake, formed a reasonable belief about a matter of fact that negates the kind of culpability required for commission of the offense. *See* TEX. PENAL CODE ANN. § 8.02(a).

reversed our judgment and remanded the case to this Court to determine if appellant was harmed by the trial court's failure to instruct the jury on mistake of fact. *See id.*

We reverse and remand.

## Background

La Porte Police Department ("LPD") Officer G. Saldivar testified that on the evening of Friday, March 20, 2015, he was on patrol. At about 8:22 p.m., Saldivar was dispatched to a collision at the 2400 block of Sens Road in La Porte, Harris County, Texas, following an emergency-assistance call reporting a deceased person at that location. When Saldivar arrived, it was "dark," and lighting in the area was "low." But Saldivar had no difficulty locating John Ambrose, the complainant, who was lying "on the side of the road" between two parked trucks. The complainant had "shallow breathing" but "was unresponsive." Harold Forest, the person who had found the complainant and called for emergency assistance, was also present at the scene.

Officer Saldivar contacted local emergency medical services. The complainant received emergency medical treatment and was airlifted to the hospital. Saldivar also contacted the Harris County Constable's Office ("HCCO"), Precinct 8, and asked them to send their "crash team" to assist with the investigation because they had "more experience with accident reconstruction and accidents that involved fatalities."

Forest testified that he had a parking lot in front of his residence and ran a business out of his home. Forest returned home on the evening of March 20, 2015, in his "yellow box truck." It was dark and he had his headlights on. As he turned into his driveway, he noticed an obstruction, so he "backed up and got the lights on." He saw the complainant lying in the gravel beside Forest's parked "dually" truck. The complainant "looked dead" and had "[b]lood running out of his head." Forest called for emergency assistance.

Mary Ann Bernard testified that the complainant was her brother and after a collision on March 20, 2015, the complainant was airlifted to a hospital where he stayed for an extended period of time in the intensive care unit. The complainant could no longer walk or talk and required breathing and feeding tubes. Eventually, he was moved to the Trinity Nursing Home ("Trinity") in San Augustine, Texas. He died in June 2016 "as a result of an infection from either his breathing or feeding tubes."

Ahmed Hashim testified that he is a critical care and pulmonary physician and the complainant was in his care while he worked at Trinity. According to Hashim, the complainant was transported unresponsive and on a ventilator to Trinity from The Methodist Hospital in Houston, Texas in March 2015 after having suffered a traumatic brain injury from a motor-vehicle collision. The complainant was bedridden, chronically ill, and unresponsive. He was on a ventilator and had a

4

tracheostomy and a feeding tube. He had pneumonias, decubitus ulcerations, and other infections, the kinds of "infections that happen to people" who have "these kind[s] of chronic illness[es] with multiple tubes in them." He showed no signs of improvement before he died on June 26, 2016 from sepsis, "which, tracing back, came from" the traumatic brain injury.

HCCO Precinct 8 Constable M. Gonzalez testified that he is a trained accident reconstructionist with fifteen years' experience in responding to car collisions and performing accident reconstruction. On March 20, 2015, he and three other HCCO Precinct 8 "crash team" members responded to the collision scene on Sens Road, a two-lane roadway with unimproved shoulders, because there was a critical injury or death. Gonzalez and the other crash team members collected various pieces of truck debris from the scene, and Gonzalez prepared a diagram of where they found the debris. Most of the debris from the collision was in the northbound lane of Sens Road. They found metal debris and various fragments apparently from a headlight, including a yellow reflective piece, clear pieces, and part of a reflector lens. The headlight fragments had a serial number and letters which indicated that the headlight was manufactured by Ford Motor Company. The crash team also found a front bicycle wheel that appeared undamaged, a bent back bicycle wheel, and a reflector that appeared to have come from a bicycle pedal.

5

Additionally, Constable Gonzales found gouges in the road that showed a path of metal in contact with pavement from several feet inside the roadway to the middle of the shoulder. These gouges led to a fallen bicycle. Gonzalez noted that the bicycle had a red reflector and some pedal reflectors, which are typically visible to a driver driving at night with his headlights on.

Based on what the crash team found, Constable Gonzalez believed that the complainant's bicycle had been hit from behind, which damaged the rear wheel, knocked the front wheel loose, and caused the bicycle's front fork to dig into the pavement. He also believed that the slide marks in the gravel underneath a nearby parked truck meant that the impact caused the complainant to be thrown off his bicycle, slide under the truck, and come to rest on the opposite side of the parked truck. Gonzalez stated that the parked truck did not appear to be the truck that caused the collision because it did not have damage that he would have associated with the collision.

HCCO Precinct 8 Detective C. Poteet testified that he is a member of the "crash team" and a certified level 1 accident reconstructionist. He went to the collision scene on Sens Road on March 20, 2015. At the scene, among the debris, Poteet found a piece of plastic that "had a stamp . . . that said 'FoMoCo,'" which is a Ford Motor Company trademark, as well as a sticker showing a 2010 manufacture date. That discovery gave the crash team "a time frame [for] when that particular

6

piece [of plastic] would have been made." And the size of the recovered piece of plastic indicated to the crash team that it had belonged to some "sort of a truck." Poteet also recovered the complainant's bicycle. From the evidence collected at the collision scene, the crash team concluded that "the bicycle [that the complainant was riding] was traveling northbound and was struck from the rear by a [truck]" that was "also traveling northbound at a higher rate of speed." The crash team reached that conclusion because of the "[d]amage to the bicycle, the debris field left from the striking [truck] as well as where the bicycle and [the complainant] ended up."

During Detective Poteet's testimony, a diagram of the collision scene drawn by Poteet was admitted into evidence. According to Poteet, it showed that the debris trail spread north of the impact location "[b]ecause the striking [truck] had continued" traveling "north after impact," which made the debris "get[] strewn across the road" in that way.

Detective Poteet further testified that to find the truck involved in the collision, the crash team "created fliers" requesting "tips" about the identity of the driver and truck. Because the area where the collision occurred was industrial, the crash team "g[a]ve out [the fliers] to the local businesses" as well as to broadcast news outlets. The flyers were distributed the on morning of Monday, March 23, 2015, and the crash team received "tips" in response.

7

According to Detective Poteet, through investigating the "tips," law enforcement officers determined that appellant was the driver of the truck involved in the collision with the complainant. They located appellant's home, which was about a mile northwest of the collision scene. Poteet then contacted an LPD "detective to use his unmarked car to travel to [appellant's] residence" to "see if the [truck involved in the collision] happened to be in the driveway." That law enforcement officer found a different vehicle at appellant's home and "ran the plate" on that vehicle, which "came back to a business," AECOM Technical Services ("AECOM"), in La Porte. Poteet then contacted AECOM and spoke with Brent Patterson, an employee of AECOM. Patterson confirmed that appellant was an employee of AECOM and provided Poteet with additional information about a white truck that appellant had been driving on Friday, March 20, 2015. Poteet was able to then locate appellant's truck, and he saw damage on the truck that was consistent with what he would have expected to see on the truck involved in the collision with the complainant, because "a lot of the debris that was left on the scene came from what [the crash team] believe[d] was a headlight assembly."

As to whether appellant, as the driver of the truck, was aware that his truck hit the complainant, Detective Poteet testified that the crash team ruled out the possibility that the truck struck the side of the bicycle in a passing motion because the bicycle "would have done other things as far as it would have been in a spinning

8

motion. The front wheel probably would not have ended up where it was and there would [have] be[en] more damage to the sides of the [bicycle] . . . than there [wa]s." Based on the accident reconstruction, Poteet did not see any reason for appellant not to have been aware that he was about to strike a person on a bicycle. The crash team "did some test runs using [the complainant's] bicycle in the street with the red rear reflector facing south. [They] used a comparable [truck] within the same year range, an F-150 . . . . And at no point [w]ould [appellant] have not seen a person riding that bicycle." Poteet believed that appellant would have known or been aware of the impact of the bicycle and the truck because of the "sound and feel" of a truck "hit[ting] hard enough to do that damage to a bicycle and that much damage to the front of [the] truck." Poteet also believed that appellant was aware that there had been a collision because the debris path showed that the truck took an "evasive maneuver after impact" with the complainant and his bicycle. Poteet noted that both appellant's truck and the complainant's bicycle were given to LPD Officer R. Gallion who "did . . . forensics."

Officer Gallion testified that he has twelve years' experience as a trained crime scene investigator. Although he did not respond to the collision scene on Sens Road on March 25, 2015, he was asked to examine a white Ford-150 truck for possible front-end damage. Gallion did not find any damage to the front driver's side of the truck but did find damage "at the very corner" of "the passenger front

end," which consisted of "[d]enting of the passenger-side front [fender well] quarter panel and [damage to] the headlight assembly." The truck also had some horizontal "grazing marks" where the paint appeared to have been removed "in two different areas."

Officer Gallion further noted that the truck's passenger-side headlight had some mud inside the damaged area, suggesting that the truck had been driven through mud after the light was broken. And Gallion found damage to the plastic or metal parts underneath or behind the reflective part of the headlight. In addition to the headlight damage, Gallion observed damage above the wheel well on the front-passenger side of the truck, but he was "not sure if that . . . happened at the time of the [collision]" or "afterwards." And when washed the mud off the truck, he found "[s]ome more gouge marks on the passenger[-]side fender" as well as "gouge marks around the curve of the fender."

Once he completed his visual inspection, Officer Gallion "looked for blood" and examined the pieces of evidence collected "at the [collision] scene to see if they matched up with the [truck]." He was able to fit together some of those pieces into the headlight of the truck "like putting a puzzle together." He applied a spray to detect blood and collected swabs from the area that showed the presence of blood or possible DNA. He sent the swabs to a laboratory for testing.

Officer Gallion also examined the bicycle involved in the collision. The bicycle was missing its front wheel, and on the rear wheel, "[t]he spokes were all bent and the rim itself [wa]s cracked in two." The front fork where the front wheel would have fit "appeared to have been bowed out like some force had been pushed down on the front of it and it bowed them out, so [it] didn't just go right into the frame of the rim." He was "not sure how much force need[ed] to be applied to crack an original rim," but to him, "it looked like something with a lot of force had cracked those two rims in those two places." Gallion noted that on the kickstand, he saw "a white spot" that "look[ed] like some recent smoothing ha[d] occurred." And he stated that "[s]triations from the bicycle on the inside of the fork[]" and the bent brake assembly were "consistent with the same downward force of impact on the front of the bicycle" that he had described.

Officer Gallion noted that the bicycle had safety equipment, namely, "[a] rear reflector and then also pedal reflectors," as well as "a light on the front." The light did not work when he tried to turn it on, so he did not know if it was operational when the collision occurred. He believed that the bicycle "had been struck from behind" because of the "damage to [its] rear wheel," the crack in the rim, the front tire coming off but remaining intact, and the forks being bowed out. And he "didn't see damage on it that would be consistent with being struck from the side." The damage to the truck that Gallion examined and the damage to the bicycle were

11

consistent with them striking each other and with the truck striking the rear of the bicycle as they were both traveling in the same direction.

Brent Patterson testified that he works for AECOM, which provides construction management services, and that he supervised appellant when appellant was employed there. Appellant did "inspection work" for AECOM and was assigned a "white Ford truck" for his "work vehicle." On Monday, March 23, 2015, appellant notified Patterson that the truck he was assigned "was damaged" by "something [that] flew up and hit it" and he needed "to pick up another vehicle so [the truck] could get fixed." When appellant dropped the truck off, Patterson instructed him to report the collision to the company that leased trucks to AECOM. Patterson then examined the truck. He noticed that it looked like "something hit the front right quarter" panel. He acknowledged that it did not appear that the truck had been washed over the weekend and that appellant could have repaired the headlight during the weekend but did not. Patterson gave Officer Gallion written consent to examine the truck.

Rhonda San Filipo testified that appellant was her boyfriend. On the evening of Friday, March 20, 2015, at "a little after 8:00, maybe 8:10 [p.m.]," appellant, in his truck, and San Filipo, following in her car, were driving to appellant's home after having dinner at a restaurant. Appellant had two margaritas at dinner. They had

also had lunch together at about 1:00 p.m. that day, during which appellant had two twenty-three-ounce beers.

According to San Filipo, Sens Road was narrow and "very dark"; there were "hardly any lights at all" and "not many properties." San Filipo was about a car length and a half behind appellant, and they were driving "probably between [thirty] and . . . [forty]" miles an hour.

San Filipo testified that she did not see a bicycle in the roadway. But as she and appellant were driving, "[t]he glass from the headlight" on appellant's truck "shattered." She could see it because the shards reflected in his headlight. She "could tell it startled him and . . . [the truck] jerked a little bit." Appellant then "immediately hit his brakes." San Filipo first thought that "somebody threw a bottle at [appellant's truck]." She did not see the complainant and would have stopped if she had.

Appellant and San Filipo continued driving to appellant's home. Once they saw the extent of the damage to appellant's truck's headlight, appellant got into San Filipo's car and they returned to the location where the headlight had shattered. As she drove slowly by the location, she saw the silhouette of a man standing behind one of the trucks in the driveway. She could not see anything below that because it was so dark. When she saw the man, she thought that maybe he had thrown something. And she believed that there was a party in the house nearby because of

all the cars and trucks parked in the driveway. San Filipo and appellant did not stop. To San Filipo, "it didn't seem like it was a big deal actually because it was just a headlight."

According to San Filipo, she first realized that the collision might have involved something other than a bottle when she saw a television news broadcast about a possible hit-and-run in the same area and at about the same time that appellant's truck's headlight had shattered. She "was in shock." She told appellant about the news broadcast in a telephone conversation on Tuesday, March 24, 2015. San Filipo had seen appellant on the previous Sunday, and he did not appear concerned, frightened, or upset. But after appellant was told by law enforcement officers that he was involved in the collision, he "was very distraught."

Appellant testified that he had been a road and bridge inspector for AECOM for three and a half years. On Friday, March 20, 2015, he was driving down Sens Road at about 8:15 p.m. The sun had set about an hour before, and there was "very, very poor lighting" on the road. Appellant "could hardly see anything, it was just so dark." He acknowledged that if there had been a person riding a bicycle in the road, he would have been able to see the rider from a distance, even if the bicycle did not have safety reflectors. Appellant did not see anything as he approached the 2400 block of Sens Road, but he "had a headlight" suddenly "burst."

14

At that point, appellant did not believe that he had a collision with either a person or a car. He now understood that he had been mistaken. At the time, he felt "a moment of shock" and "believed that somebody either threw something, or hit something, or something hit [his] truck, or that it was just something that had just came up off the road." Appellant did not stop when the collision happened because there was a building by the street that "looked like a business establishment where they serve[d] food or something."

According to appellant, he and San Filipo arrived at appellant's home about two minutes later and looked at his truck. Because his headlight was "out" on his truck, he and San Filipo returned to the location where his truck's headlight had shattered in San Filipo's car. Once there, appellant planned to "take a look" to see if he could "find anything or see anything." But they did not stop because he was afraid that he "would get into an altercation with someone else or someone that [he] d[id not] know was around." Appellant did not remember seeing the bicycle or the complainant. He "did not believe that [he] was in a[] [collision]." Appellant acknowledged, though, that he would have seen the complainant on the ground if he had gotten out of San Filipo's car.

Appellant further testified that he called Patterson at 8:00 a.m. on Monday, March 23, 2015, to report the damage to his truck. He told Patterson that the damage occurred in the 2400 block of Sens Road. A few days later, he learned that Patterson

15

had called law enforcement officers with a "tip" about appellant. When San Filipo told appellant about the hit-and-run television news broadcast on the Tuesday, March 24, 2015, he was "very, very upset and very hurt." He did not sleep that night. Appellant acknowledged that, even though he had previously stated he did not contact an attorney until Tuesday, his cellular telephone records showed that he first contacted an attorney on Monday, March 23, 2015.

Clyde Rooke testified that he is an accident reconstructionist and was hired by the defense. He used to be an officer with the Houston Police Department and worked in the accident division and the crash reconstruction unit. When he retired from law enforcement, he became a civilian accident reconstructionist.

Rooke reviewed Detective Poteet's diagram of the collision, and he disagreed with Poteet's conclusion that appellant's truck veered into the oncoming lane of traffic after the collision. Rooke also noted that when driving on a narrow road, a driver is more likely to look to the left at oncoming traffic and not the right because of the greater danger of a collision with oncoming traffic. Rooke stated that he did not believe that the complainant was riding his bicycle several feet into the road when appellant hit him from behind. Under that scenario, he claimed, the complainant's bicycle would have been thrown forward and not to the right. Rooke concluded that the complainant, whose blood-alcohol concentration was more than

16

twice the legal driving limit,[3] had pulled out onto the road from Forest's driveway just as appellant's truck passed by him. Rooke believed that the bicycle's seat, not its back wheel, hit the truck because both the truck headlights and the bicycle seat were thirty-six inches from the ground.

Rooke agreed that appellant had made a mistake in believing that he was hit by a beer bottle when he had actually struck the complainant's bicycle. Rooke also confirmed that his conclusions relied heavily on an assumption that the complainant would have ridden in Forest's driveway to avoid the road, as well as the statements of appellant and his girlfriend. And Rooke acknowledged that the physical evidence from the scene was consistent with Detective Poteet's opinion.

### Standard of Review

We review complaints of jury-charge error under a two-step process. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2004); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether error exists in the trial court's charge. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). Here, the Texas Court of Criminal Appeals has already determined that error exists in the trial court's charge because appellant was entitled to an instruction as to "whether he made a reasonable mistake in thinking that no one involved in the accident was injured or killed or in thinking that the accident was not

---

[3]     *See* TEX. PENAL CODE ANN. § 49.01(2)(B).

reasonably likely to have injured or killed another person." *See Curry II*, 622 S.W.3d at 311. Thus, our focus is on the second step, which requires us to determine whether the lack of the required instruction caused sufficient harm to require reversal of the conviction. *See Wooten*, 400 S.W.3d at 606. If the defendant preserved error by timely objecting to the trial court's charge, as appellant did here, we will reverse if he demonstrates that he suffered some harm as a result of the trial court's error. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). To determine harm, we weigh the following factors: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) any other relevant factors present in the record. *Id.* Under the some-harm standard, reversal is required if the error is "calculated to injure the rights of the defendant." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985); *Ramjattansingh v. State*, 587 S.W.3d 141, 156 (Tex. App.—Houston [1st Dist.] 2019, no pet.). The standard thus "requires a reviewing court to determine actual, rather than mere theoretical, harm." *Ramjattansingh*, 587 S.W.3d at 156 (internal quotations omitted). Even under the some-harm standard, an error will not lead to reversal if it is harmless. *See Almanza*, 686 S.W.2d at 171.

**Mistake of Fact**

In his second issue, appellant argues that the trial court erred in denying his request for a jury instruction on mistake of fact and he "suffered great harm when the trial court denied his jury instruction" because "[t]he issue of whether [a]ppellant

18

knew that he had been involved in an accident was the primary focus of both the State and the [d]efense in the evidence they presented to the jury."

At the close of evidence, appellant requested that the trial court include a jury instruction on mistake of fact. Appellant's requested jury instruction stated:

> If you all agree that the State has proved, beyond a reasonable doubt, each of the elements listed above, you must next consider whether the State has proved that [appellant] did not make a Mistake of Fact constituting a defense.
>
> You have heard evidence that [appellant] did not believe that he had been in an accident but that someone had intentionally thrown an object that struck the right headlight fixture area of the truck he was driving.
>
> A person's conduct that would otherwise constitute the crime of Failure to Stop and Render Aid is not a criminal offense if the person through a mistake formed a reasonable belief about a matter of fact and the mistaken belief negated the kind of culpability required for commission of the offense.
>
> [Appellant] is not required to prove that he made a mistake of fact. Rather, the State must prove, beyond a reasonable doubt, that [appellant] did not make a mistake of fact constituting a defense.
>
> "Reasonable belief" means a belief that an ordinary and prudent person would have held in the same circumstances as [appellant].
>
> If you have found that the State has proved the offense beyond a reasonable doubt, you must next decide whether the State has proved [appellant] did not make a mistake of fact constituting a defense.
>
> To decide the issue of mistake of fact, you must determine whether the State has proved, beyond a reasonable doubt that either—

1. [Appellant] did not believe that someone had thrown an object that struck the right headlight fixture area of the truck he was driving; or

2. [Appellant's] belief that someone had thrown an object that struck the right headlight fixture area of the truck he was driving was not reasonable.

You must all agree that the State has proved, beyond a reasonable doubt, either element 1 or 1 [sic] above. You need not agree on which of these elements the State has proved.

If you all agree that the State has proved, beyond a reasonable doubt, each of the elements of the offense of Failure to Stop and Render Aid and you all agree that the State has proved, beyond a reasonable doubt, either element 1 or 2 listed above, you must find [appellant] "Guilty[.]"

If you find that the State has failed to prove, beyond a reasonable doubt, either element 1 or 2 listed above, or you have a reasonable doubt thereof, you must find [appellant] "Not Guilty."

In its opinion in *Curry II*, the Texas Court of Criminal Appeals analyzed the current version of the "failure-to-stop-and-render-aid" statute, i.e., Texas Transportation Code section 550.021, explaining that under it,

a driver must stop and render aid not only if the driver knows that he was involved in an accident and another person was injured or killed . . . , but also if he knows that he was involved in an accident that was reasonably likely to result in injury to or the death of a person. . . . The corollaries to this are that a driver does not have to stop and render aid if he does not know that he was involved in an accident, if he knows that he was involved in an accident and knows that it did not result in injury to or the death of a person, or if he knows that he was involved in an accident, but it was not reasonably likely that the accident would result in injury to or the death of another person, or if he knows that he was involved in an accident, but it was not reasonably

20

likely that the accident would result in injury to or the death of another person.

*Curry II*, 622 S.W.3d at 309 (internal citations and footnotes omitted); *see* TEX. TRANSP. CODE ANN. § 550.021. Curry's proposed mistake-of-fact instruction, which the trial court rejected, corresponds to the first corollary in the Texas Court of Criminal Appeals's opinion, stating that appellant "did not believe that he had been in an accident but that someone had intentionally thrown an object that struck the right headlight fixture area of the truck he was driving." *See id.*

The application paragraph in the trial court's charge to the jury instructed the jury that if it found appellant

> did then and there unlawfully, while driving or operating a vehicle, was involved in an accident that resulted in or that was reasonably likely to result in death to [the complainant], and [appellant] intentionally or knowingly failed to immediately stop his vehicle at the scene of the accident or as close to the scene of the accident as possible, failed to immediately return to the scene of said accident, failed to immediately determine whether a person was involved in said accident and determine whether any person at the scene of said accident or determine whether any person at the scene of said accident required aid, and failed to remain at the scene of said accident until [appellant] had given his name and address to [the complainant] or made arrangements for transporting [the complainant] to a physician or hospital for medical treatment, it being apparent that said medical treatment was necessary, then [it was to] find [appellant] guilty.

This instruction did not explain to the jury that it had to find that appellant knew he was involved in an accident, only that appellant "intentionally or knowingly failed to immediately stop his vehicle" at the scene of the collision. Yet, appellant and San

21

Filipo both testified that that they were aware that something had happened while appellant was driving on Sens Road but they did not know that it was a collision involving the complainant. Appellant believed that "somebody either threw something, or hit something, or something hit [his] truck, or that it was just something that had just c[o]me up off the road." And because it looked like there was "a party in the nearby house" or that the house was "a business establishment where they serve[d] food," appellant intentionally did not stop because he was afraid that he "would get into an altercation with someone else or someone" that he did not "know was around." When appellant and San Filipo later returned to the scene, San Filipo saw the silhouette of a man standing by a truck and thought that maybe he had thrown something. In sum, appellant admitted, and other evidence showed, that he intentionally did not stop. But the evidence also showed that appellant, at the time, did not believe he had been involved in an accident that resulted in or that was reasonably likely to result in the complainant's death.

In his opening argument, appellant's trial counsel posed the question of whether it was "a reasonable mistake of fact under these circumstances" that appellant did not know that he had a collision with the complainant. And in his closing argument, appellant's trial counsel asked if, under the circumstances, the jury "would . . . automatically think that [each of them had] hit a person, or a vehicle? Or could it have been something that hit [the truck]? A bottle, a rock, some

22

object fl[ew] up?"  Trial counsel emphasized that appellant did not believe that he hit anything and argued that, for appellant to be guilty of the felony offense of failure to stop and render aid, he "had to know he was involved in an accident."  Yet the trial court's charge to the jury did not allow the jury to find appellant not guilty because he did not know that he was involved in the collision with the complainant.

We hold that that the trial court's failure to instruct the jury on mistake-of-fact resulted in some harm to appellant.  *See Reeves*, 420 S.W.3d at 816.

We sustain appellant's second issue.

## Conclusion

We reverse the judgment of the trial court and remand the case to the trial court for a new trial.

Julie Countiss
Justice

Panel consists of Justices Goodman, Landau, and Countiss.

Do not publish.  TEX. R. APP. P. 47.2(b).

23